**ELLWOOD TEXAS FORGE CORPORATION,**
Appellant

v.

**Bobby JONES and Kelly Jones, Appellees.**

No. 14–05–00909–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 9, 2007.

Chad M. Forbes and Thomas C. Wright, Houston, for appellant.

Darrin Walker, Kingwood, Joseph B. Stephens, Katy, for appellees.

Panel consists of Justices FOWLER, EDELMAN, and FROST.

## OPINION

WANDA McKEE FOWLER, Justice.

Ellwood Texas Forge Corporation ("Ellwood") hired Process Installations ("PI"), an independent contractor, to remove and replace an air conditioning unit on top of a machine called a "manipulator" on Ellwood's premises. Bobby Jones, an employee of PI, was injured when he fell from the top of the manipulator. He and his wife, Kelly, sued Ellwood for negligence. A jury returned a verdict in favor of the Joneses, and the trial court entered a final judgment on the jury's verdict. On appeal, Ellwood contends, among other things, that the evidence is legally and factually insufficient to support the jury's finding that Ellwood retained or exercised control over PI's work, as required by section 95.003 of the Texas Civil Practice and Remedies Code. For the reasons explained below, we agree with Ellwood and reverse and render a take-nothing judgment against the Joneses.

**Factual Background**

Ellwood is a steel-forging plant located in Houston, Texas. During the forging process, a manipulator is used to transfer heated metal in and out of furnaces and into a press that is used to shape the metal into forms. The manipulator has a cab where the operator sits and operates its controls. Because the manipulator is near the furnace, it is hot inside the cab, so Ellwood installed air conditioning units on its manipulators.

In June of 2001, Ellwood hired PI, an independent contractor that had worked for Ellwood in the past and was familiar with the plant, to perform several jobs on its premises, including removing and re-

placing the air conditioning unit on one of the manipulators. The unit to be replaced was on top of the manipulator's cab, about twelve feet above the ground. To accomplish the job, PI provided a crew consisting of a supervisor, Robert Wesley,[1] and two workers, Bobby Jones and Andy Franco. Wesley met with Jimmy Wegner, the maintenance coordinator at Ellwood, to discuss replacing the air conditioner on the manipulator. Wegner gave Wesley a copy of the air conditioning manufacturer's diagram of the unit, and told him to replace the old air conditioning unit with a new one. Wegner gave no additional directions or orders concerning the work.

The PI crew went to work removing the old air conditioning unit and replacing it with the new one. At some point, as the new unit was lowered onto its base, Jones climbed up a ladder to the top of the manipulator to check the unit's placement while Franco operated a crane used to lower the unit on top of the manipulator's cab. Jones was not using any fall protection. After the unit was lowered into place on top of the cab, Jones fell and was injured.

At trial, one of the issues was whether Ellwood controlled the PI employees' work. Jones and his wife tried to show control by highlighting Ellwood's safety procedures and the actions of certain Ellwood employees. Ellwood did not dispute

that it had written safety procedures that applied to independent contractors as well as to employees. The procedures required, among other things, that employees working more than six feet off the ground must use proper fall protection equipment, and employees were authorized to stop any work they saw being done in an unsafe manner. Additionally, before PI began its assignments for that week, Wegner and Wesley signed an Ellwood "safe work permit" that was intended to identify the jobs PI was to perform and the safety equipment required. No specific fall protection devices were identified for use.[2]

Wegner, Ellwood's maintenance coordinator, stated that he did not know the PI employees were working on the manipulator without fall protection, but if he had seen them doing so he would have stopped the job until proper fall protection was used. However, Jones testified that Wegner was standing near the manipulator talking to Wesley shortly before Jones fell and knew the PI employees were working without fall protection.[3] Both Jones and Wesley testified that Wegner never warned them of any danger or told them to stop working and get proper fall protection. Wesley also testified that about one month or so earlier, Wegner had seen PI employees working on a similar job on top of a manipulator and knew they were not using fall protection. Wegner denied this.

---

1. Robert Wesley is the brother of Bobby Wesley, the owner of PI. Bobby Wesley is also Bobby Jones's brother-in-law.

2. Wegner testified that the safe work permit was filled out before the specific jobs to be done were listed on the permit. Wesley, the PI supervisor, confirmed that PI and Wegner did not know exactly what their assignments would be at the start of the week when the permit was signed.

3. By deposition, Franco testified that Wegner "would come around" the area where they

were working during the two or three days they worked on the manipulator, but no testimony was offered concerning Wegner's whereabouts on the day Jones fell. Although Wesley testified generally that Wegner knew the PI crew was on top of the manipulator, he also testified that when Bobby Jones fell, Wegner and Franco were the only people present. During the defense case, Ellwood's attorneys offered Wesley's deposition testimony in which he stated that Wegner was not in the area on the day Jones fell.

In response to a question from Jones's attorney, Wegner agreed that he could control the details of PI's work "if he wanted to." But Wegner also testified that Wesley, the PI supervisor, had the right to control the details of the job he was given. Billy Matthews, a plant services manager at Ellwood and Wegner's supervisor, testified that Wesley, not Wegner, controlled the details of PI's work replacing the air conditioning unit on the manipulator. Matthews also testified that Ellwood paid extra for a PI supervisor and skilled workers so the work could be performed without supervision by Ellwood personnel.[4] Concerning safety, Matthews testified that both Wegner and Wesley were responsible for making sure the work was done safely, and he agreed that Ellwood personnel could forbid PI from working in a dangerous manner without proper fall protection. Matthews also testified that Wesley had permission to use all of Ellwood's equipment, including safety equipment on the premises.

Robert Wesley testified PI's safety program was "basically the safety plan of the plant that we worked in" and that "[t]he responsibility for the safety and the job itself was mine because it was our crew." He agreed that he had access to and could use Ellwood's safety equipment without asking permission. Wesley also agreed that he knew that fall protection was needed, but he did not believe that fall protection devices could be used in the area,[5] so he instead decided to proceed with the work carefully. Concerning control over the work, Wesley agreed that Ellwood was paying PI not only for labor but for supervision of the job. Wesley testified that, once Wegner gave him the assignment of replacing the air conditioning unit on the manipulator, the details of the work were left to his discretion, judgment, and control, and he did not expect anyone at Ellwood to tell him or his crew how to go about the details of their work. He also stated that the manufacturer's diagram of the air conditioning unit that Wegner gave him was of no use to him, and he relied on his experience and skill to complete the job. Finally, Wesley admitted that even if fall protection were checked off on the safe work permit, he and his crew would still have gone about the job the same way.

## Analysis

In its first issue, Ellwood contends the evidence is legally and factually insufficient to support the jury's finding that Ellwood retained or exercised control over the manner in which the air conditioner installation on the manipulator was performed, as is required under Texas Civil Practice and Remedies Code Chapter 95 to impose liability on a property owner for the acts of an independent contractor or its employee. Ellwood contends that Chapter 95 eliminates passivity by the premises owner as a basis of liability for injury to a contractor or its employees on the premises, because it requires proof of a landowner's actual control and subjective awareness of a danger before liability will be imposed. Jones responds that, because the evidence is legally and factually sufficient to show that Ellwood had the right to forbid PI from working without fall protection and to dictate what fall protection PI used, and that Ellwood's supervisor knew

---

4. Wesley testified that Bobby Jones was a skilled worker and Andy Franco was a helper.

5. Specifically, Wesley testified that he did not think he could use a harness and lanyard or a belt and lanyard because there was no place to attach it to a structure, and he did not think he could get a man lift in the area. Bobby Jones testified to essentially the same opinions. Wesley also agreed that he could have rented any equipment Ellwood did not have and PI would be reimbursed.

PI was working in an unsafe manner, Ellwood had a duty to stop PI's employees from working in an unsafe manner.

For the reasons explained below, we disagree with Jones and hold that Ellwood's right to forbid PI employees from doing their work in a dangerous manner is insufficient to impose a duty on Ellwood to ensure that PI and its employees followed Ellwood's safety rules and regulations.

## I. Standards of Review

When both legal and factual sufficiency challenges are raised on appeal, an appellate court must first examine the legal sufficiency of the evidence. *See Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 752 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (citing *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981)).

We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of a vital fact; (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822. But, "if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. We credit favorable evidence if reasonable jurors could credit it, and disregard contrary evidence unless reasonable jurors could not disregard it. *See id.* We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *See id.* at 822.

When considering a factual sufficiency challenge to a jury's verdict, we must review and weigh all of the evidence, not just the evidence that supports the verdict. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 768–69 (Tex.App.-Houston [14th Dist.] 2004, no pet.). We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Nip*, 154 S.W.3d at 769.

To address Ellwood's issues on appeal, we will consider the evidence adduced at trial, to assess if it proved that Ellwood had a sufficient amount of control over PI's work.

## II. Control

### A. A Brief Review of the Case Law Before Chapter 95 was Enacted.

In Texas, the general rule is that an owner or occupier has no duty to see that an independent contractor performs work in a safe manner. *See Abalos v. Oil Development Co.*, 544 S.W.2d 627, 631 (Tex.1976). In 1985, the Texas Supreme Court in *Redinger v. Living, Inc.*, adopted section 414 of the Restatement (Second) of Torts, which provided an exception to the general rule when a premises owner or general contractor exercises some control over the work of an independent contractor or subcontractor:

One who entrusts work to an independent contractor, but who retains the control over any part of the work, is subject to liability for physical harm to others

for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985) (citing RESTATEMENT (SECOND) OF TORTS § 414 (1977)). The employer's role must be more than a general right to order the work to start or stop, to inspect progress, or to receive reports. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 414, cmt. c (1965)).

As this court explained in *Dyall v. Simpson Pasadena Paper Co.*, opinions— even Texas Supreme Court opinions—applied section 414 inconsistently. *See* 152 S.W.3d 688, 697–98 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (en banc) (comparing and contrasting selected post-*Redinger* case law). Some of the cases reached results inconsistent with the public policy of minimizing work-related injuries. For example, in two cases, the Texas Supreme Court held that the employer had the right to control the independent contractor's or subcontractor's work based on the employer's own safety requirements and was liable for failing to require the independent contractor or subcontractor to comply with those safety requirements. *See id.* (discussing *Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469 (Tex.1985) and *Lee Lewis Const., Inc., v. Harrison*, 70 S.W.3d 778 (Tex.2001)). In these two cases, we noted in *Dyall* that the premises owner or general contractor who incurred liability "would have been in a more legally advan-tageous position if it had not promulgated safety rules and procedures." *Id.* at 698.

In contrast, in other cases, the Texas Supreme Court rejected the notion that a premises owner had a right to control the independent contractor's work as a consequence of promulgating its own safety measures such as using a safety employee to observe the contractor's work or requiring the contractor to comply with the owner's safety rules and regulations. *Id.* (citing *Koch Refining Co. v. Chapa*, 11 S.W.3d 153 (Tex.1999) and *Dow Chem. Co. v. Bright*, 89 S.W.3d 602 (Tex.2002)). As the Texas Supreme Court explained in *Dow Chem. v. Bright*, " 'it is not enough that the premises owner has merely a general right to order the work stopped ... [t]o hold otherwise would deter general contractors from setting even minimal safety standards.' " *Id.* at 698 (citing *Dow Chemical Co. v. Bright*, 89 S.W.3d 602, 607–08 (Tex.2002)).[6]

**B. Chapter 95 Increased the Requirements for Liability to be Imposed.**

As the case law evolved, the Texas Legislature enacted Chapter 95 of the Texas Civil Practice and Remedies Code as part of a sweeping tort-reform package. *Id.* at 699; *see* TEX. CIV. PRAC. & REM.CODE § 95.001–.004. Chapter 95 provides that a property owner is not liable for the personal injury, death, or property damage to a contractor or his employees who construct, repair, renovate, or modify an improvement to real property, including inju-

---

**6.** In addition to the salutary public policy of protecting workers, we noted in *Dyall* two additional reasons to question the wisdom of imposing liability upon the property owner for injuries sustained by independent contractors. First, the independent contractor has often been hired for its expertise in the work to be done and its superior ability to see that the work is done safely. *Dyall*, 152 S.W.3d at 698 (citing *Lee Lewis Const.*, 70 S.W.3d at 796 (Hecht, J., concurring)). Second, an employer's liability for accidents should not increase the harder he tries to ensure that his independent contractors work safely and decrease the less he cares what happens. *Id.* We further explained that the rationale of subjecting employers to liability for injuries sustained by independent contractors was inconsistent with our modern system of worker's compensation. *Id.* at 698–99.

ries arising from the failure to provide a safe workplace, unless:

(1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

*Dyall,* 152 S.W.3d at 699; Tex. Civ. Prac. & Rem.Code § 95.003.

 The effect of section 95.003 was to codify the *Redinger* court's adoption of section 414 of the Restatement and to further limit a property owner's liability by requiring a plaintiff to prove that the owner had actual knowledge-as opposed to constructive knowledge—of a dangerous condition. *Dyall,* 152 S.W.3d at 699. Consequently, under Chapter 95, the plaintiff has the burden to show both control and actual knowledge of the danger. *Id.* An owner may be aware of the danger, but exercise no control, or he may exercise control and have no actual knowledge of the danger; in either instance, the owner is statutorily shielded from liability. *Id.*

Here, the jury was asked to consider only the first prong—control—and it is the jury's affirmative finding on control that Ellwood challenges. Guided by the foregoing discussion, we turn to a review of relevant authorities and the facts of this case to determine whether the evidence supports the jury's finding.

**1. The case law defines "control" in a very precise manner.**

 Control may be proven in two ways: (1) a contractual right of control or (2) an exercise of actual control. *Dow Chem. Co. v. Bright,* 89 S.W.3d 602, 606

(Tex.2002); *Elliott–Williams Co., Inc. v. Diaz,* 9 S.W.3d 801, 804 (Tex.1999); *Chi Energy, Inc. v. Urias,* 156 S.W.3d 873, 879 (Tex.App.-El Paso 2005, pet. denied). The owner, to be liable, must have the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way. *Diaz,* 9 S.W.3d at 804. "[T]he right to control the work must extend to the 'operative detail' of the contractor's work." *Urias,* 156 S.W.3d at 880. Further, the control must relate to the injury the negligence causes. *Diaz,* 9 S.W.3d at 804. It is not enough that the owner has the right to order the work to stop and start or to inspect progress or receive reports. *See Bright,* 89 S.W.3d at 606; Tex. Civ. Prac. & Rem.Code § 95.003(1). Nor is it enough to recommend a safe manner for the independent contractor's employees to perform the work. *Bright,* 89 S.W.3d at 607.

In *Hoechst–Celanese Corp. v. Mendez,* the Texas Supreme Court held that, when an employer requires an independent contractor to observe workplace safety guidelines, it does not impose on the employer an unqualified duty of care to ensure that the independent contractor's employees did nothing unsafe. *See* 967 S.W.2d 354, 357–58 (Tex.1998) (per curiam). Instead, the employer owes a narrow duty "that any safety requirements and procedures it promulgated did not unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* at 358. This result, the Court explained, was consistent with its prior precedents and section 414 of the Restatement, because the employer's duty of care was "commensurate with the control it retain[ed] over the contractor's work." *Id.* at 357.

The next year, in *Koch Refining Co. v. Chapa,* the Court again considered the duty of a premises owner to an indepen-

dent contractor and its employees, and held that the premises owner, merely by placing a safety employee on the work site to observe the independent contractor's work, did not incur a duty to an independent contractor's employees to intervene and ensure that they perform their work safely. *See* 11 S.W.3d 153, 157 (Tex.1999) (per curiam). Moreover, the Court stated that an employee's willingness to follow a premises owner's instructions, though no such instructions were given, did not constitute legally sufficient evidence of the premises owner's right to control such that a duty arises. *Id.* at 156 (citing *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 224 (Tex.1999)).

Following *Mendez* and *Koch Refining Co.*, the Court determined in *Dow Chemical Co. v. Bright* that the premises owner did not exercise actual control when it had a safety representative on site who could have stopped the independent contractor's employee from working had it known of the safety hazard on its premises. *See* 89 S.W.3d at 608. The Court also rejected the argument that the premises owner exercised control because it had implemented a safe work permit system, which gave it the general right to preclude the work from beginning in the first instance, but it allegedly failed to properly conduct an on-site inspection before issuing the safe work permit for the contractor's work. *Id.* at 608–09. As the Court explained, "[t]he fact that Dow implemented a safe work permit system as an attempt at creating a safer construction site did not unreasonably increase the probability and severity of Bright's injury." *Id.* at 608. Thus, neither the presence of a Dow safety representative at the site nor Dow's safe work permit system constituted evidence that Dow controlled the method of the independent contractor's work or its operative details. *Id.* 608–09.

### 2. The facts of this case do not prove control.

■ Turning to the case before us, Jones contends the evidence shows that Ellwood had a right to enforce its safety rule requiring fall protection, knew PI was violating this rule, and did not forbid PI from working in that dangerous manner. Jones contends Ellwood's right to forbid the work from being done in a dangerous manner, combined with its actual knowledge that Jones and the other PI employees were violating Ellwood's safety rule by working over six feet off the ground without fall protection, is sufficient to impose a duty on Ellwood.

*a) The right to forbid does not necessarily equal control.*

Central to Jones's claim that Ellwood retained control over PI's work is Ellwood's right to forbid PI from working without fall protection and to dictate what fall protection PI used. The evidence showed that Ellwood's safety rules included a rule requiring anyone working over six feet high to use fall protection. This rule applied to both Ellwood employees and independent contractors on its premises, and any Ellwood employee had the authority to stop any unsafe work being performed on Ellwood's property. Additionally, Jones points to Wegner's testimony that (1) if he saw a contractor working higher than six feet without fall protection it was his responsibility to stop him and either get him fall protection or get him off the equipment, (2) if he had seen Jones and his coworkers working on the manipulator without fall protection, he would have "definitely" stopped them, (3) he would "certainly" stop someone he saw from violating one of Ellwood's safety rules, (4) if he saw someone on top of a manipulator it would be his duty to tell them to get down or get fall protection equipment immediately, and (5) if Wesley had asked him how

to do the job, he would have instructed him on the manner and details concerning how to do the job safely. Matthews, Wegner's supervisor, agreed that working on the manipulator without fall protection was unsafe, and Ellwood could (1) forbid the work from being done in a dangerous manner, (2) forbid PI from using the wrong equipment to do the job, and (3) forbid PI from doing it out of the man lift in the wrong way. Jones also contends Ellwood's safety program imposed upon Ellwood's employees like Wegner a duty to observe work-related hazards and unsafe behaviors and to tell the workers—including contractors—how to do the work correctly.

 However, this evidence and the case law do not support Jones's contention that "the right to forbid the work from being done in a dangerous manner is sufficient to impose a duty." The Supreme Court has established that a premises owner, by requiring an independent contractor to follow its safety rules and regulations, does not owe the independent contractor's employee a duty to ensure that the employee does nothing unsafe. *Mendez*, 967 S.W.2d at 357–58. Instead, the premises owner assumes only a narrow duty to ensure that its rules or requirements do not unreasonably increase the probability and severity of injury. *Id.* at 358. Moreover, actual control is not demonstrated when a premises owner's safe work permit system gives it the right to preclude work from beginning in the first instance or stopping it after it has commenced. *Bright*, 89 S.W.3d at 608–09. Nor is actual control demonstrated when the premises owner places a safety representative on site to observe the independent contractor's work. *Koch Refining Co.*, 11 S.W.3d at 157 ("[A] premises owner, merely by placing a safety employee on the work site, does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work.").

Likewise, the testimony that Wegner had the *right* to forbid the work from being performed in a dangerous manner, or that he would have stopped the work and required fall protection *if* he had seen Jones not using fall protection, or that he *could have* asserted control "if he had wanted to" is insufficient to impose liability because section 95.003 requires an assertion of actual control, not simply the possibility of control. *See Koch Refining Co.*, 11 S.W.3d at 156 (stating that the possibility that the Koch safety employee might intervene and forbid the independent contractor's employee from working in a dangerous manner was not evidence that Koch exercised the degree of control necessary to create a duty); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex.1999) ("A possibility of control is not evidence of a 'right to control' actually retained or exercised.").

 The First Court of Appeals recently rejected an argument very similar to the argument Jones makes. In *Phillips v. Dow Chemical Co.*, the plaintiffs asserted wrongful death, survival, and bystander claims on behalf of an employee of an independent contractor who died after falling from scaffolding at Dow's plant. *See* 186 S.W.3d 121, 125 (Tex.App.-Houston [1st Dist.] 2005, no pet.). The trial court granted summary judgment in favor of Dow, holding that Dow did not retain or exercise a right of control over the independent contractor's work. *Id.* at 125–26. In affirming the trial court's judgment, the court of appeals explained:

It is undisputed that Dow's safety supervisor had the right to order work stopped for safety violations or concerns and had done so on occasion in the past. But, this right does not suffice as a fact

issue that could trigger section 95.003(1)'s first condition for nonliability, because section 95.003(1) explicitly requires that the premises owner exercise or retain more control over the manner in which work is performed than the right to order it stopped. *See* TEX. CIV. PRAC. & REM.CODE § 95.003; *Dow Chem. Co.*, 89 S.W.3d at 608. Moreover, although it is also undisputed that Dow engaged independent safety personnel to supervise the cleanup project, mere presence of the premises owner's safety personnel at a worksite is likewise insufficient to demonstrate that the owner actually exercised control over the work. *See Dow Chem. Co.*, 89 S.W.3d at 608. *Id.* at 135. We agree that a premises owner's right to forbid independent contractors from beginning or continuing their work in an unsafe manner is not evidence of actual control.

b) *Contrary to Jones's claim, facts peculiar to this appeal do not prove Ellwood exercised control.*

Jones contends, however, that additional facts not present in other cases show that Ellwood did incur a duty to prevent PI's employees from working on the manipulator without fall protection. Jones points to the testimony that Ellwood's maintenance coordinator, Jimmy Wegner, knew the PI employees would be working on the manipulator, saw the PI employees working on the manipulator without fall protection, and witnessed Jones climbing on the

manipulator and then falling off a few minutes later. There was also some testimony, although not entirely clear, that Wegner had seen the PI crew working on a similar manipulator without fall protection about a month earlier. However, this evidence goes to whether or not Ellwood had "actual knowledge" of a danger and failed to adequately warn PI's employees. Actual knowledge of a danger goes to the second prong of section 95.003; it does not substitute for evidence of "control" over the independent contractor's work, as the first prong of section 95.003 requires. *See Dyall*, 152 S.W.3d at 705 (noting the statute suggests that the two elements are distinct). Thus, this evidence does not demonstrate that Ellwood retained or exercised the requisite control over PI and its employees. *See id.* at 699 (noting a premises owner is not liable under section 95.003 if he is aware of the danger but exercises no control over the independent contractor).

Jones also argues that the testimony shows that Ellwood hired PI to supplement its own workforce and to perform work Ellwood's employees were just as competent to perform. Therefore, Jones asserts, Ellwood retained the right to control the manner and details of PI's work because it "supervised" [7] the work, it had the right to forbid PI's work from being done in a dangerous manner, and it had the right to require PI to comply with its rules. By this argument, Jones appears to suggest that, because Wegner gave PI its

---

**7.** In support of its contention that Wegner supervised PI's work, Jones points to the testimony of Andy Franco and himself. Franco testified that Wegner "usually told us what to do there." When asked to describe what he was told, Franco stated, "we were told to remove that unit and install a new one." Jones testified that, while doing his work during the week, he would see Wegner "[a]ll day, every day" and he described how Wegner wanted pallet pushers built a certain way, telling him "where the material was to build it" and "what kind of welding rods to use." When asked to describe Wegner's personality, Jones testified that "He wants to make sure everybody knows he's in control. He's a nice guy, but he wants you to know that he's the one calling the shots." He also testified that Wegner would inspect their work daily, and "if he didn't like it, he would tell you about it."

assignments, observed its employees' work, and could have done the same job with Ellwood personnel, Ellwood retained control over PI's work. However, the evidence of Wegner's "supervision" demonstrates only that Wegner gave PI its assignments and observed the work the PI employees did. Every premises owner must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability. *Koch Refining Co.*, 11 S.W.3d at 156; *see also Mendez*, 967 S.W.2d at 356 ("It is not enough that [the employer] has merely a general right ... to inspect [the work's] progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.") (quoting RESTATEMENT (SECOND) OF TORTS § 414, cmt. c). And, as discussed above, the possibility that Ellwood personnel could have retained or exercised control over the work does not address whether they did so on the occasion in question.

■ Further, Jones's argument is inconsistent with the testimony concerning how the assignment to replace the air-conditioning unit on the manipulator was given and carried out. Wegner did testify that Ellwood employees were able to do "all types of work" on manipulators, including work on the air-conditioning units; however, he also stated that because his crew is small, Ellwood hires others to handle big jobs. He also agreed that he knew how to work on the manipulators and could tell others how to do it correctly, safely, and with the right tools. But, Billy Matthews, Wegner's supervisor, testified that Ellwood paid extra for a PI supervisor and skilled workers so the work could be performed without supervision by Ellwood personnel. Robert Wesley, the PI supervisor, agreed that Ellwood was paying for

both labor and supervision. When an employer hires an independent contractor for their particular expertise and merely observes the independent contractor's work, that employer does not trigger liability under section 95.003. *See Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 571 (Tex.App.-Eastland 2000, pet. denied).

Having reviewed the record, we hold there is no evidence that Ellwood personnel had the right to control or exercised actual control over the operative details of PI's work to the extent that PI was not free to do the work its own way. When Wegner gave Wesley, the PI supervisor, the assignment to replace the air-conditioning unit on the manipulator, he handed Wesley the manufacturer's diagram of the new air-conditioning unit and he instructed Wesley to remove the old air-conditioning unit and replace it with another on the premises. Wesley testified that, once he received that assignment from Wegner, the details of the work were left to his discretion, judgment, and control. Wesley also testified that if Jones wanted fall protection then Jones would have used it, and Ellwood was not involved in his and Jones's decision not to do so. Additionally, the PI employees used their own tools for most of the work, and Ellwood personnel did not tell them what tools to use. On these facts, the evidence is legally insufficient to establish that Ellwood retained or exercised actual control over PI's work as required to impose liability under Texas Civil Practice and remedies Code section 95.003. *See Bright*, 89 S.W.3d at 608–09; *Koch Refining Co.*, 11 S.W.3d at 157; *Mendez*, 967 S.W.2d at 357–58; *Phillips*, 186 S.W.3d at 135–36; *Dyall*, 152 S.W.3d at 707.

## Conclusion

In summary, that Ellwood's maintenance supervisor had the right to forbid PI's employees from working on the ma-

nipulator without fall protection, but did not stop PI's employees from doing so and did not require them to use proper fall protection before continuing, does not constitute evidence that Ellwood retained or exercised control over PI's installation of the air conditioner on the manipulator on its premises. Because section 95.003(1) of the Texas Civil Practice and Remedies Code requires that the property owner exercises or retains some control over the manner in which the work is performed before a premises owner may be found liable for the acts of its independent contractors under Chapter 95, the Joneses cannot prevail on their claims.

We reverse the trial court's judgment and render a take-nothing judgment against Bobby Jones and Kelly Jones.