

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-18-00830-CV

Rene **VELA**,
Appellant

v.

**MURPHY EXPLORATION & PRODUCTION COMPANY-USA** and Nabors Drilling
Technologies, Inc.,
Appellees

From the 365th Judicial District Court, Dimmit County, Texas
Trial Court No. 14-05-12283-DCV-AJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Rebeca C. Martinez, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed: December 27, 2019

AFFIRMED

Rene Vela sued Murphy Exploration & Production Company-USA ("Murphy") and

Nabors Drilling Technologies, Inc. ("Nabors") under a premises liability theory and for gross

negligence after he suffered personal injuries while working for T-Force Energy Services, Inc.

("T-Force") at an oil well site that was owned and operated by Murphy. Nabors owned a drilling

rig on Murphy's well site. Murphy and Nabors each filed traditional and no-evidence motions for

summary judgment, which the trial court granted. On appeal, Vela contends neither defendant was

entitled to summary judgment. We affirm.

**BACKGROUND**

Murphy owned and operated the Stumberg Ranch Well Site (the "well site") where Vela was injured. The well site had four wells on a single pad that were twenty-five feet apart from one another (Wells: 1H, 2H, 3H, and 4H). A "cellar" surrounded each of the well bores (Well 1H Cellar, Well 2H Cellar, Well 3H Cellar, and Well 4H Cellar). A cellar is generally a six-to-ten-foot hole constructed beneath the drilling rig that acts as a sort of "containment barrier" around the well to trap water, mud, oil, or other contaminants that may come out of the well bore while the rig is drilling.

Murphy contracted with Nabors "to furnish and operate" the M17 drilling rig. The M17 drilling rig was positioned over Well 2H. Murphy contracted with T-Force, a rig-moving company, to move the M17 drilling rig from Well 2H to Well 4H. Nabors was responsible for disassembling the M17 drilling rig before the rig-move, and T-Force, pursuant to its contractual obligations with Murphy, was then responsible for moving the M17 drilling rig from Well 2H and positioning it over Well 4H. Under these arrangements, Nabors and T-Force were both subcontractors of Murphy, and Nabors and T-Force did not have a contractual relationship with each other.

Located on top of the Well 4H Cellar were several 8-foot wide, 40-foot long, 2,000-pound matting boards, and located on top of the matting boards were two 80,000-pound mud pumps. On the morning of June 29, 2012, using a T-Force crane and forklift, Vela, as the "rigger" employed by T-Force, rigged up the two mud pumps to the crane and the T-Force crane operator maneuvered the pumps off the matting boards. The T-Force forklift operator then removed the matting boards. Without the matting boards covering the mouth of the Well 4H Cellar, the Well 4H Cellar was unsecured and open. After the matting boards were removed from the mouth of the Well 4H

Cellar, Vela fell into the Well 4H Cellar while walking to retrieve his tagline.[1] Vela sustained personal injuries as a result of his fall.

Vela filed suit against Murphy and Nabors based on a theory of premises liability and gross negligence. Vela alleged that Murphy and Nabors knew the Well 4H Cellar was unsecured, which was an unreasonably dangerous condition, and they chose not to secure it and that Murphy and Nabors were required to warn Vela and others similarly situated about the unreasonably dangerous conditions existing on the premises. Nabors filed a no-evidence and traditional motion for summary judgment claiming that Nabors, as a co-subcontractor, did not owe T-Force or its employees a duty under a premises liability theory because Nabors was not the owner of the well site, and did not exert control, or assume responsibility over, the well site sufficient to give rise to a legal duty. Murphy filed a no-evidence and traditional motion for summary judgment claiming Chapter 95 of the Texas Civil Practice and Remedies Code shielded Murphy from liability as a matter of law. The trial court granted both motions for summary judgment but did not specify the grounds it relied upon. Vela appeals.

## STANDARD OF REVIEW

We review a trial court's summary judgment *de novo*. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). When a trial court does not specify the grounds it relied upon in granting summary judgment, "reviewing courts must affirm summary judgment if any of the grounds asserted are meritorious." *Id.* "If a party moves for summary judgment on both traditional and no-evidence grounds, as the [appellees] did here, we first consider the no-evidence motion." *Id.*

---

[1] The tagline controls the load the crane is holding.

In a no-evidence motion for summary judgment, "the movant must first assert that no evidence exists as to one or more elements of a claim the nonmovant would have the burden of proof [on] at trial." *Covarrubias v. Diamond Shamrock Ref. Co.*, 359 S.W.3d 298, 301 (Tex. App.—San Antonio 2012, no pet.). "Once the movant has alleged no evidence exists as to one or more elements, the burden is then shifted to the nonmovant to present more than a scintilla of evidence which raises a genuine issue of material fact on each of the challenged elements." *Id.*

> Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (internal citation omitted) (first quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); then quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "If the nonmovant fails to produce more than a scintilla of evidence, there is no need to analyze whether the movant's proof satisfies the Rule 166a(c)—traditional motion for summary judgment—burden." *Covarrubias*, 359 S.W.3d at 301.

In a traditional motion for summary judgment, the movant "bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law." *Lightning Oil Co.*, 520 S.W.3d at 45. If the movant establishes its right to judgment as a matter of law, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact. *Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383, 390 (Tex. App.—San Antonio 2018, pet. filed). "When reviewing a traditional motion for summary judgment, we review the evidence in the light most favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion." *Lightning Oil Co.*, 520 S.W.3d at 45.

**DISCUSSION**

In two issues, Vela contends the trial court erred in granting summary judgment in favor of Murphy and Nabors. We address the propriety of summary judgment as to each appellee separately.

**A. Murphy's Motion for Summary Judgment**

Vela contends the trial court erred in granting summary judgment in favor of Murphy because Chapter 95 of the Texas Civil Practice and Remedies Code does not apply to Vela's claims.

a. *Applicability of Chapter 95*

Chapter 95 "limits property owner liability on claims for personal injury, death, or property damage caused by negligence." *Abutahoun v. Dow Chemical Co.*, 463 S.W.3d 42, 53 (Tex. 2015). If Chapter 95 applies, "its tenets regulate the viability of each claim [the appellant] alleged that involve negligence, that is, his claims of active negligence, premises liability, and gross negligence." *Torres v. Chauncey Mansell & Mueller Supply Co., Inc.*, 518 S.W.3d 481, 494 (Tex. App.—Amarillo 2017, pet. denied). "If Chapter 95 applies, it is the plaintiff's 'sole means of recovery.'" *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 561 (Tex. 2016) (quoting *Abutahoun*, 463 S.W.3d at 51). Chapter 95 applies to a claim:

> (1) against a property owner . . . for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and

> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE § 95.002. Additionally, "[c]hapter 95 only applies when the injury results from a condition or use of the *same* improvement on which the contractor (or its employee) is working when the injury occurs." *Ineos*, 505 S.W.3d at 567 (emphasis added). Murphy, as the

property owner, has the initial burden of establishing that Chapter 95 applies to Vela's claim. *Cox v. Air Liquide Am., LP*, 498 S.W.3d 686, 689 (Tex. App.—Houston [14th Dist.] 2016, no pet.). "Because a party may not obtain a no-evidence summary judgment on an issue for which it bears the burden of proof, we construe this part of [Murphy's] motion as a motion for traditional summary judgment." *Id.*

Thus, for Chapter 95 to apply, Murphy was first required to show that: "(1) it is a property owner against whom a contractor's employee asserts a personal injury claim[.]" *Lopez v. Ensign U.S. S. Drilling, LLC*, 524 S.W.3d 836, 843 (Tex. App.—Houston [14th Dist.] 2017, no pet.). The parties do not dispute that Murphy meets the requirements of section 95.002(1). Murphy, as the mineral leaseholder, is a property owner. *See id.* (defining a mineral lease holder as a "property owner" for purposes of section 95.002(1)). Vela's claim is against Murphy, a property owner, for personal injury, and Vela is an employee of T-Force, a contractor. Thus, section 95.002(1) is satisfied.

We next consider whether Murphy established the elements of section 95.002(2), which required Murphy to show that Vela's injury arose from a condition or use of an improvement to Murphy's property where T-Force and Vela were constructing, repairing, renovating, or modifying that same improvement when Vela's injury occurred. *See* TEX. CIV. PRAC. & REM. CODE § 95.002(2). In its summary judgment motion, and on appeal, Murphy argues that section 95.002(2) is established because (a) the Well 4H Cellar is an improvement to real property; (b) Vela's injury arose from the unsecured condition of the Well 4H Cellar; and (c) Vela and T-Force were constructing, repairing, renovating, or modifying the Well 4H Cellar when his injury occurred. Vela contends the cellar is not an improvement to real property, and "even if it were an improvement, T-Force and Vela were not on Murphy's site to do anything to the cellar. They were not there to construct, repair, renovate, or modify the cellar."

We first consider whether Murphy established as a matter of law that the Well 4H Cellar is an "improvement" for purposes of section 95.002(2). Chapter 95 does not define what constitutes an "improvement to real property," but, in interpreting Chapter 95, the Texas Supreme Court has broadly construed the term "improvement" to include "all additions to the freehold except for trade fixtures [that] can be removed without injury to the property." *Abutahoun*, 463 S.W.3d at 49 (quoting *Sonnier v. Chisholm–Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995)). It is also "settled law . . . that mineral wells constitute improvements to real property." *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 85 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Fox v. Thoreson*, 398 S.W.2d 88, 89 (Tex. 1966)).

The description of a "cellar" in the summary judgment record is undisputed, and it is undisputed that this description applies to the Well 4H Cellar. A cellar is generally a six-to-ten-foot hole constructed beneath the drilling rig that acts as a sort of "containment barrier" around the well to trap water, overflow mud, and chemicals that might flow out of the wellbore during drilling. According to Vela's expert witness, the walls of the cellar are generally lined with corrugated steel or a plastic kind of lining in order to protect the soil from chemical contamination, the inside of the cellar likely contains a conduit and a pump to dispose of the liquids collecting in the cellar, and cellars are usually constructed "every single time" a well is drilled. Thus, the cellar, much like a mineral well, is an "addition to the freehold," "involves the assembly of materials" into a cylinder-type structure, and will remain a permanent structure of the well site working in conjunction with the mineral well. *Cf. Coastal Oil*, 130 S.W.3d at 85 (recognizing that "mineral wells constitute improvements to real property" because a well "involves the assembly of materials into a permanent structure" and remains on the well site after it is drilled). Given the Texas Supreme Court's directive to broadly construe the term "improvement," we determine, as a matter of law,

that the Well 4H Cellar is an "improvement" to real property under Chapter 95. *See Abutahoun*, 463 S.W.3d at 49.

Murphy was also required to show that Vela's injury arose from the condition or use of the Well 4H Cellar for section 95.002(2) to apply. *See* TEX. CIV. PRAC. & REM. CODE § 95.002(2). Vela does not contest this element, and the summary judgment evidence shows Vela's injuries were the result of him falling into the unsecured condition of the Well 4H Cellar.

Last, for section 95.002(2) to apply, Murphy was required to show that T-Force and Vela were constructing, repairing, renovating, or modifying the cellar when his injury occurred. *See* TEX. CIV. PRAC. & REM. CODE § 95.002(2). Murphy argues T-Force and Vela modified the Well 4H Cellar at the time of Vela's injury by removing the mud pumps, matting boards, and metal grate covering the mouth of the cellar. Vela contends T-Force's and Vela's work at the well site was limited to moving the rig and never extended to the construction, modification, renovation, or repair of the Well 4H Cellar.

Chapter 95 does not define the terms "constructs, repairs, renovates, or modifies," but our sister courts have given these words their ordinary meaning. *See, e.g.*, *Montoya v. Nichirin-Flex, U.S.A., Inc.*, 417 S.W.3d 507, 512 (Tex. App.—El Paso 2013, no pet.) ("The Legislature has not defined the terms 'constructs,' 'repairs,' 'renovates,' or 'modifies,' as used in Section 95.002(2). Consequently, the words must be given their ordinary meaning."). The ordinary meaning of the terms are as follows:

1. construct—to build or form by putting together parts; frame; devise.

2. repair—to restore to a good or sound condition after decay or damage; mend: to repair a motor; to restore or renew by any process of making good, strengthening, etc.: to repair one's health by resting.

3. renovate—to restore to good condition; make new or as if new again; repair.

4. modify—to change somewhat the form or qualities of; alter partially.

*Id.* at 512 (quoting WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 463, 1236, 1632 (2003)). Murphy argues T-Force and Vela modified, altered, or "changed the form or qualities of," the Well 4H Cellar by removing the mud pumps, matting boards, and metal grate from the mouth of the cellar in furtherance of the rig move operation. Vela does not contest that T-Force removed the mud pumps or matting boards but disputes that the Well 4H Cellar was covered by a metal grate. We review the evidence in the light most favorable to Vela and consider the issue as if the Well 4H Cellar were not covered by a metal grate. *See Lightning Oil Co.*, 520 S.W.3d at 45.

The undisputed summary judgment evidence shows T-Force was tasked with moving the M17 drilling rig from Well 2H to Well 4H. On top of the Well 4H Cellar were several 8-foot wide, 40-foot long, 2,000-pound matting boards, and on top of the matting boards were two 80,000-pound mud pumps. Vela, as T-Force's "rigger," rigged up the two mud pumps to the crane and the T-Force crane operator maneuvered the pumps off the matting boards. The T-Force forklift operator then removed the matting boards. After the matting boards were removed from the Well 4H Cellar, Vela walked to retrieve his tagline to rig up other equipment to the crane and as he did so, he fell into the Well 4H Cellar.

Pursuant to the statute's ordinary and plain meaning, we conclude that the work being done by T-Force and Vela at the time of Vela's injury was of the type covered by Chapter 95. *See* TEX. CIV. PRAC. & REM. CODE § 95.002(2). By removing the mud pumps, matting boards, and other equipment positioned on top of the Well 4H Cellar, T-Force and its employees modified the Well 4H Cellar by altering and changing the Well 4H Cellar from its secured form into its unsecured form. In fact, according to Vela's own testimony and the testimony of his expert, had T-Force not removed the matting boards covering the Well 4H Cellar, Vela would not have fallen into the Well 4H Cellar. Thus, it was the Well 4H Cellar's altered state that contributed to Vela's injury.

Relying on *Hernandez v. Brinker International Inc.*, 285 S.W.3d 152 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (plurality opinion), Vela argues T-Force and its employees were hired to move the M17 drilling rig from Well 2H to Well 4H and were not hired to do anything to the Well 4H Cellar. In *Brinker*, the appellant was hired to repair an air-conditioning system, but was injured by a separate improvement, the appellee's roof. *Id.* at 157. The plurality determined that the appellant did not modify or repair the appellee's roof and further stated "Chapter 95 does not apply to a contractor's employee's claim against a property owner when the improvement the condition or use of which gives rise to the injury claim is not the same improvement the contractor was at the premises to address at the time of injury." *See id.* at 157–58. However, here, the Well 4H Cellar is the "same improvement [T-Force] was at the premises to address." The undisputed summary judgment evidence shows that T-Force's and Vela's responsibilities at the well site included more than merely moving the M17 drilling rig from Well 2H to Well 4H. Rather, the undisputed evidence shows that modifying the Well 4H Cellar by removing the equipment and matting boards was a necessary component of T-Force's rig-move operation. When asked why the matting boards were removed from the mouth of the Well 4H Cellar, Vela testified the matting boards had to be moved in order to perform the rig move. Steven Saenz, a T-Force employee and Vela's supervisor, indicated in his testimony that "when you're moving the rig into [position], [the cellar's] got to be uncovered." Vela's expert confirmed that the equipment and the matting boards covering the Well 4H Cellar had to be moved in order to properly position the rig over Well 4H. Additionally, the drilling report from the day of Vela's accident indicated that the day's tasks included: "rig down and move motor package, backyard, and mats, reorganize mats and prepare to walk rig forwards to Stumberg 4H well." Thus, it is incorrect for Vela to assert that "T-Force and Vela were not on Murphy's site to do anything to the cellar" when modifying the Well 4H Cellar by removing the equipment and matting boards from the mouth of the cellar was necessary

for T-Force to complete its rig-move from Well 2H to Well 4H. *See Hernandez v. Driscoll Children's Hosp.*, No. 13-17-00446-CV, 2019 WL 3819868, at *3 (Tex. App.—Corpus Christi-Edinburg 2019, no pet.) (mem. op.) (determining that although the plaintiff was hired to install an MRI machine, "the MRI machine could not have been installed without [first] repairing and modifying the breaker box," and thus, the breaker box was an improvement the plaintiff was hired to repair).

Vela also points to Saenz's testimony that T-Force did not construct or modify the Well 4H Cellar. However, "[c]onclusory testimony or affidavits are not competent summary judgment evidence and are insufficient to create a question of fact to defeat summary judgment." *Montoya*, 417 S.W.3d at 513. Notably, Saenz confirmed that it was T-Force's responsibility to make sure the rig was positioned over the Well 4H Cellar in a way that was supposed to give the M17 drilling rig "access to that cellar." Such access would not have been possible without first modifying the Well 4H Cellar by removing the equipment and matting boards from the mouth of the cellar.

Murphy has met the requirements of section 95.002(2) because it established that: (a) the Well 4H Cellar is an improvement to real property; (b) Vela's injury arose from the unsecured condition of the Well 4H Cellar; and (c) Vela and T-Force were constructing, repairing, renovating, or modifying the Well 4H Cellar when his injury occurred. *See* TEX. CIV. PRAC. & REM. CODE § 95.002(2). For the foregoing reasons, we conclude that Murphy met its initial burden of establishing that Chapter 95 applies to Vela's claims, and Vela did not raise a genuine issue of material fact sufficient to defeat summary judgment on that basis.[2] *See Driscoll*, 2019 WL 3819868, at *4.

---

[2] Because we find that Chapter 95 applies to Vela's claims, we need not address Vela's alternative argument that Murphy owed common law duties to Vela. *See Ineos*, 505 S.W.3d at 561 (explaining that when Chapter 95 applies, the plaintiff cannot recover under the common law because Chapter 95 "is the plaintiff's 'sole means of recovery'").

*b. Exceptions to Chapter 95*

Section 95.003 provides for exceptions when Chapter 95 would otherwise apply, and Vela argues that he provided some evidence for the application of an exception to defeat summary judgment. We disagree.

Section 95.003 provides that a property owner is not liable for personal injury to a contractor or an employee of a contractor who constructs, repairs, renovates, or modifies an improvement to real property unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
>
> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. "Once the defendant has shown that Chapter 95 applies to the [plaintiff's] claim, the plaintiff has the burden to establish both prongs of section 95.003" to establish an exception. *Montoya*, 417 S.W.3d at 511. Because the plaintiff must show both control and actual knowledge, a property "owner may be aware of the danger, but exercise no control, or he may exercise control and have no actual knowledge of the danger; in either instance, the [property] owner is statutorily shielded from liability." *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

i. ***Control***

"Control may be proven in two ways: (1) a contractual right of control or (2) an exercise of actual control." *Id.* (citing *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002)). For the property owner to be liable under Chapter 95, the control must include:

> the [property owner's] right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor is not entirely free to do the work his own way. The right to control the work must extend to the operative detail of the contractor's work. It is not enough that the owner has

the right to order the work to stop and start or to inspect progress or receive reports. Nor is it enough to recommend a safe manner for the independent contractor's employees to perform the work.

*Moreno v. BP Am. Prod. Co.*, No. 04-08-00036-CV, 2008 WL 4172248, at *3 (Tex. App.—San Antonio Sept. 10, 2008, pet. denied) (mem. op.) (internal citations omitted).

It is undisputed that Murphy did not have a contractual right of control. The plain language of the contract provision[3] shows that Murphy did not have a contractual right to control the manner in which T-Force performed its work. *See Jacobs v. Huser Constr., Inc.*, 429 S.W.3d 700, 704–05 (Tex. App.—San Antonio 2014, no pet.) (concluding similar language in a contract did not give the property owner "the right to control the means, methods, or details" of the independent contractor's work).

On appeal, Vela contends he presented some evidence that Murphy exercised actual control over the manner in which T-Force performed its work. However, Vela's own testimony concedes that Murphy did not exercise actual control over the manner in which T-Force performed its work. Vela stated no one from Murphy ever told him how to do his job, and that he received his work instructions from either the T-Force crane operator or from Saenz, his T-Force supervisor. *See Covarrubias*, 359 S.W.3d at 303. Vela argues, however, that "Murphy decided where the rig would be moved" and "T-Force played no role in the decision on where to move the rig." However, moving the M17 drilling rig to the spot designated by Murphy was T-Force's job.

---

[3] The contract between Murphy and T-Force stated:

> [T-Force] will at all times be an independent contractor, and nothing in this Agreement will be construed as creating the relationship of principal and agent, or employer and employee . . . . [*T-Force*] *will have operational control, supervision and management of the Work*, the selection of employees and the fixing of their hours of labor, *and no right is reserved to* [*Murphy*] *to direct or control the manner in which the Work is performed, as distinguished from the result to be accomplished*.

(emphasis added).

"Being told what one's job is and to go do it is far different than being told *how* to do one's job. It is the latter form of conduct that evinces the type of control needed to impose liability upon a property owner, not the former." *Torres*, 518 S.W.3d at 494 (emphasis added). Vela contends Murphy's drilling report is evidence of actual control because it "gave instructions about the work to be accomplished that day, and the order in which the work would be done." We disagree. A property owner "must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability." *Ellwood*, 214 S.W.3d at 704. The fact that Murphy's company man gave T-Force and Nabors their general assignments for the day does not indicate the right to control the manner, means, or details of T-Force's work. *See id.* Vela also claims Murphy's company man was the person in charge of the well site and "the entire operation." However, "the control element is not satisfied simply through proof that the property owner [or its representative] had control of the facilities." *Torres*, 518 S.W.3d at 491. Rather, "[t]he right to control the work must extend to the operative detail of . . . [T-Force's] work." *Moreno*, 2008 WL 4172248, at *3.

Vela argues that on the day of the accident, Murphy conducted a mandatory pre-job safety meeting with T-Force, and that Murphy's company man was present at the job site and signed off on the Job Safety Analyses ("JSA")[4] prepared for the work being done. A mandatory safety meeting, however, does not demonstrate actual control over the manner, means, or details of T-Force's work, nor does a safety procedure requiring Murphy's company man to sign off on the JSAs evidence actual control. *See Union Carbide Corp. v. Smith*, 313 S.W.3d 370, 378 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 701–02 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). The presence of

---

[4] According to the deposition testimony, a JSA analyzes the safety risks and hazards associated with a job and recommends ways to eliminate them.

Murphy's company man on the job site is also not indicative of actual control. *See Ellwood*, 214 S.W.3d at 702. Vela further claims Murphy could have asserted control over the manner in which T-Force performed its work, if it wanted to. However, section 95.003(3) requires "actual control, not simply the *possibility* of control." *Id.* (emphasis added); *see Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (per curiam). Thus, "the possibility that [Murphy] personnel could have retained or exercised control over [T-Force's] work does not address whether they did so on the occasion in question." *Ellwood*, 214 S.W.3d at 704.

After reviewing the summary judgment record in the light most favorable to Vela, we conclude Vela failed to produce more than a scintilla of evidence showing Murphy exercised actual control over the manner in which T-Force performed its work. *See id.* at 304. Thus, we need not address whether Murphy had actual knowledge of the danger or condition resulting in Vela's injury. *See Moreno*, 2008 WL 4172248, at *3. Accordingly, we affirm the trial court's order granting Murphy's motion for summary judgment on Vela's premises liability and gross negligence claims because Murphy established as a matter of law that Chapter 95 applies. *See Torres*, 518 S.W.3d at 491.

### B. Nabors's Motion for Summary Judgment

Nabors owns the M17 drilling rig that T-Force was contracted to move. Nabors sought traditional and no-evidence summary judgment on Vela's premises liability and gross negligence claims, and the trial court granted summary judgment in Nabors's favor. Vela contends he presented more than a scintilla of evidence raising a genuine issue of material fact on each element of his premises liability claim against Nabors, including that Nabors: (1) occupied and was in control of the premises, giving rise to a legal duty, (2) knew of the unsecured cellar, which was an unreasonably dangerous condition, and chose not to secure it or warn of its peril; and (3) was required to warn Vela and others similarly situated about unreasonably dangerous conditions on

the premises. Vela also contends he presented more than a scintilla of evidence raising a genuine issue of material fact on each element of his gross negligence claim. We disagree.

Under Texas law, a claimant who is injured on another person's property "has two potential but mutually exclusive causes of action against the owner of the property: (1) an ordinary negligence claim arising from a negligently conducted activity on the premises, or (2) a premises liability claim for an unreasonably dangerous condition on the premises." *Lopez*, 527 S.W.3d at 845 (citing *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997)). Vela asserted in a response to Nabors's motion for summary judgment that his was not a negligent-activity case because his "injury did not occur contemporaneously with Nabors's or Murphy's negligence;" rather, Vela asserted "this is a premises defect case" based on an unreasonably dangerous condition on the premises.

Premises liability and gross negligence require a plaintiff to establish that the defendant owed the plaintiff a legal duty. *See Pinkerton's v. Manriquez*, 964 S.W.2d 39, 44 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 623 (Tex. 2009). Nabors argues there is no evidence showing it owed a legal duty to Vela. Vela asserts Nabors owed him a duty as an independent contractor in possession of the premises.

### a. Duty

"An owner or occupier of land generally has a duty to use reasonable care to make and keep the premises safe for invitees." *Villegas v. Tex. Dep't of Transp. & Rekca, Inc.*, 120 S.W.3d 26, 38 (Tex. App.—San Antonio 2003, pet. denied) (citing *Olivo*, 952 S.W.2d at 527). An independent contractor in possession of the premises "is charged with the same duty as an owner or occupier" of land. *Id.* (quoting *Olivo*, 952 S.W.2d at 527). However, an independent contractor:

> who does not own or possess [the] property assumes no liability for injury under a premises liability theory, unless [the independent contractor] assumes control over, and responsibility for, the premises. It is the possession and control which generally

must be shown as a prerequisite to liability. Accordingly, if an independent contractor is in control of the premises, he is charged with the same duty as an owner or possessor [of land].

*Id.* (internal citations omitted) (quoting *Rendleman v. Clarke*, 909 S.W.2d 56, 60 (Tex. 1995)). Absent "control over, and responsibility for, the premises," an independent contractor "who does not own or possess [the] property assumes no liability for injury under a premises liability theory." *Id.*

Murphy, as the mineral lease holder, is the owner and possessor of the well site. Because Nabors "does not own or possess [the] property," Nabors "is only subject to premises liability if it assumed control over, and responsibility for, the premises." *Id.* (citing *Rendleman*, 909 S.W.2d at 60). Thus, absent "control over, and responsibility for, the premises," Nabors does not owe a legal duty to Vela under a premises liability theory. *See id.*; *see also Pinkerton's*, 964 S.W.2d at 45–46.

Vela contends he presented some evidence to establish that Nabors had control over the well site during the rig-move operation to give rise to a legal duty. Vela argues that because Nabors actively participated in the rig-move operation, Nabors had control over the well site. The summary judgment evidence shows Murphy contracted with Nabors "to furnish and operate" the M17 drilling rig. Nabors was responsible for disassembling the M17 drilling rig before the rig-move, and T-Force, pursuant to its contractual obligations with Murphy, was then responsible for moving the M17 drilling rig from Well 2H to Well 4H. Nabors's mere presence on the well site in furtherance of its contractual duties to Murphy does not equate to "control over the premises" giving rise to a duty. *See City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986).

Vela also claims that Nabors determined where the rig was going to go, what the next order of business was, and instructed T-Force employees. However, Vela's claims on appeal are contradicted by his own summary judgment evidence. Vela stated no one from Nabors ever told him how to do his job, and he received his work instructions from either the T-Force crane operator

or from Saenz, his T-Force supervisor. Vela's claim that Nabors decided what "the next order of business" was is contradicted by Murphy's drilling report as it indicates that Murphy's company man gave T-Force and Nabors their assignments for the day. *See Pinkerton's*, 964 S.W.3d at 46 (finding an independent contractor did not exercise sufficient control over the premises where the owner of the premises supervised the independent contractor in an indirect manner). Additionally, it is undisputed that Murphy decided where the M17 drilling rig would be moved.

Vela also contends "Nabors was in possession and control of the drill site where its M17 rig was located at the time [Vela] fell into the unsecured cellar." To support this assertion, Vela points to the fact that the M17 drilling rig was Nabors's personal property. However, ownership over an object on the property does not establish control over the premises where Vela's injury occurred. *See Page*, 701 S.W.2d at 835. Even assuming "Nabors was in possession and control of the drill site where its M17 rig was located," the summary judgment evidence shows T-Force, in preparation for the rig being positioned over Well 4H, removed the equipment and matting boards covering the mouth of the Well 4H Cellar. Nabors's drilling rig had not been moved yet and was still positioned over Well 2H. Vela was injured at the Well 4H drill site, not the Well 2H drill site where the M17 drilling rig was still located.

Lastly, Vela claims that the Master-Service Agreement between Murphy and Nabors indicates that "Nabors had control over the safety and security of the premises." The contract between Murphy and Nabors provides: "[Nabors] will be solely responsible for [the] safety of its work and operations, . . . and, further, represents that it will take immediate actions to remedy any and all known unsafe conditions relating to [Nabors's] work and operations." The Master-Service Agreement between Murphy and Nabors does not show that Nabors had control over the safety and security of the entire premises; rather, Nabors had control over the safety of its own work and operations. In a similar vein, Vela also contends it was Nabors's responsibility to ensure the Well

4H Cellar was secured after T-Force removed the matting boards covering the Well 4H Cellar. However, the Master-Service Agreement does not provide that Nabors's responsibilities extended to T-Force's work and operations, or that Nabors was required to remedy any known unsafe conditions relating to T-Force's work and operations. In fact, the contract between Murphy and T-Force stated that T-Force "will be solely responsible for [the] safety of *its* work and operations" and that T-Force "has an affirmative obligation to remedy immediately any and all unsafe conditions *relating to [T-Force's] work and operations*." (emphasis added).

Based on the foregoing, we hold Vela failed to present more than a scintilla of evidence showing Nabors had control of, or responsibility over, the well site that would give rise to a legal duty under Vela's premises liability theory. *See Pinkerton's*, 964 S.W.2d 39 at 45–46.[5] Because a legal duty is an essential element of Vela's premises liability and gross negligence claims, the trial court did not err by granting Nabors's no-evidence motion for summary judgment. *See id.* at 44; *Spruell v. USA Gardens at Vail LeasCo, L.L.C.*, No. 02-12-00056-CV, 2013 WL 362740, at *5–6 (Tex. App.—Fort Worth Jan. 31, 2013, pet. denied) (mem. op.) (holding the appellants' premises liability and gross negligence claims failed because the appellants failed to establish that the appellees owed them a legal duty); *see also* TEX. R. CIV. P. 166a(i).[6]

---

[5] Vela also contends that Nabors had a right to control T-Force's work, which gave rise to a duty to ensure that T-Force performed its work in a safe manner. This argument, however, requires Vela to establish the first element of a premises-liability claim—that Nabors had control of, or responsibility over, the premises. *See Olivo*, 952 S.W.2d at 527–29 ("[T]he injured plaintiff must establish both the general contractor's right to control the defect-producing work and . . . the traditional premises defect elements."). For the reasons discussed, Vela has not established control of, or responsibility over, the well site that would give rise to a legal duty and potential premises liability. Relying on *Bennett v. Span Industries, Inc.*, 628 S.W.2d 470, 473 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.), Vela also contends, "a subcontractor may owe a common law duty to other subcontractors at a work site." However, the appellant's claim in *Bennett* was based on a theory of ordinary negligence. *Id.* at 472. Vela's theory for liability is instead one of premises liability. Thus, *Bennett* is inapplicable. *See Olivo*, 952 S.W.2d at 528–29 ("[P]remises defect cases and negligent activity cases are based on independent theories of recovery . . . ."); *see also Rendleman*, 909 S.W.2d at 60 (determining "the evidence did not raise a cause of action based on premises liability" because "appellant's duty did not arise from a matter of legal relationship, but from the duty of ordinary care at common law").
[6] Accordingly, we do not address whether Vela presented more than a scintilla of evidence raising a genuine issue of material fact with regard to the other elements of his premises liability and gross negligence claims against Nabors.

## CONCLUSION

The judgment of the trial court is affirmed.

Rebeca C. Martinez, Justice