**Opinion issued December 15, 2022**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-18-00638-CV

———————————

**MICHAEL TORRES AND ENEDINA TORRES, Appellants**

**V.**

**PASADENA REFINING SYSTEMS, INC. AND NATIONAL PLANT SERVICES, LLC, Appellees**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-27805**

---

## OPINION ON EN BANC RECONSIDERATION

Appellee, Pasadena Refining Systems, Inc. ("PRSI"), has filed a motion for en banc reconsideration of our May 10, 2022 opinion and judgment. *See* TEX. R. APP. P. 49.5. A majority of the Court has voted to grant en banc reconsideration.

We withdraw our opinion of May 10, 2022, vacate our judgment of the same date, and issue this opinion and judgment in their stead.

Appellant, Michael Torres ("Torres"), was injured at a refinery owned by PRSI when he fell from a scaffold constructed by appellee, National Plant Services, LLC ("NPS"). Torres and his wife, appellant Enedina Torres, brought premises liability claims against PRSI and NPS. PRSI and NPS filed motions for summary judgment, which the trial court granted, ordering that appellants take nothing by their claims. In six issues, appellants contend that the trial court erred in rendering summary judgment because they presented evidence raising issues of material fact.

We affirm in part and reverse and remand in part.

## Background

On December 22, 2014, PRSI retained an independent contractor, 3-J Ryan, Inc. ("Ryan"),[1] to perform turnaround work at PRSI's refinery in Pasadena, Texas. Ryan then hired NPS to construct the scaffolding necessary to perform the work.

In the weeks preceding the incident at issue, heavy rains fell at the PRSI facility. On the morning of March 18, 2015, Torres, a Ryan employee who had been working as a welder on the turnaround project for approximately 80 days, waited in his truck for the rain to stop and for direction regarding whether the day's work would proceed.

---

[1] Ryan is not a party to this appeal.

2

At around 11:30 a.m., Torres learned that work at the facility would proceed after lunch. At 2:00 p.m., a Ryan pipefitter, "Chavez," asked Torres to climb a scaffold with him to perform a "hot tap." The procedure, which involved creating a connection into a pressurized system, was considered dangerous. Torres noted that Ryan had "safety men" on site, had safety meetings at the start of each shift, and had supplied the safety harness that Torres wore. PRSI also had personnel on site.

At some point that Torres did not see, Chavez ascended the scaffold ladder and entered the "hooch"—an area on the scaffold platform lined with fire blankets and covered with a tarp to protect the work from wind and contamination. Although Torres, who stood in mud at the base of the ladder, saw that the tarp was draping over and partially blocking the entry gate to the scaffold platform, he noted that it did not look unusually dangerous. Rather, it looked like a "normal hooch." And, the scaffold builder, NPS, who inspected the scaffolds each day, had safety-tagged the scaffold in a manner indicating that it was safe for use. Torres expected to "go up and move the tarp and go in and latch [his lanyard] and go to work."

When Torres ascended the ladder and arrived at the entry gate of the scaffold platform, he "noticed that the [gate] hinge was on the right and not the left," which required him to lean over to the left side of the gate to latch his safety lanyard. He noted that he could not "latch on where the hinge [was] because [he] would have gotten entangled." In an effort to locate a space in which to attach his lanyard, he

3

tried to "throw [the tarp] over," not realizing that it was tightly secured underneath. The tension on the tarp "pulled" Torres to the left, and his muddy feet slipped off the ladder. Torres fell 13 feet to the mud and concrete below, fracturing his neck, an arm, and a rib and dislocating his shoulder.

Torres attributed his fall and injuries to his muddy feet, the placement of the access gate, the tarp impeding his access to the scaffold platform, and a lack of proper safety equipment, i.e., a self-retracting lifeline, or "yoyo,"[2] or ladder cage on the scaffold.

Appellants sued PRSI and the scaffold builder and inspector, NPS. Appellants brought a premises liability claim[3] against PRSI, alleging that PRSI owed certain duties to Torres, which it breached, in:

a.  controlling the placement of defective scaffolding equipment on PRSI's premises;

b.  failing to follow its own policies and procedures requiring that its employees ensure that a [] self-retracting lifeline be placed on the scaffold;

---

[2]  Ryan safety supervisor, Lance Harp, testified that a "yoyo" is "similar to a seat belt, whereas you have a body harness on and then the yoyo's attached to the top side of the scaffold or onto a structure adjacent to, has a cable inside of it with a spring mechanism." And, "[a]s you're climbing the ladder, if something happens and you slip, and fall, the yoyo will act like a seat belt and grab you. It won't let you fall." Ryan safety manager, Craig Houghton, testified that a safety "lanyard," unlike a yoyo, is simply a "static line with shock absorbing capabilities."

[3]  Although appellants also brought negligence claims against PRSI based on the same allegations, appellants, in their summary-judgment response, "agree[d] that their case sound[ed] in premises liability and not ordinary negligence."

4

c. requiring that [Torres] and his employer perform work in an area of PRSI's premises that was known to PRSI to be unsafe;

d. failing to remedy or warn of a known, unreasonably dangerous condition on its premises;

. . . .

f. fail[ing] to provide adequate safety equipment;

. . . .

j. recklessly failing to ensure the safety of equipment for use;

. . . .

l. recklessly disregarding the safety of [Torres]; [and]

m. failing to maintain a reasonably safe premises[.]

Appellants also asserted a premises liability claim[4] against NPS, alleging that NPS owed certain duties to Torres, which it breached, in:

a. erecting unsafe scaffolding;

b. failing to ensure that the scaffolding it erected contained proper fall protection;

c. failing to ensure that the scaffolding could be used safely;

d. failing to plan and provide for safe ingress and egress to the scaffold platform;

e. certifying that the scaffolding was safe for use, when it in fact was not;

f. fail[ing] to properly train its employees;

g. fail[ing] to provide adequate safety equipment;

---

[4] Although appellants, in their petition, titled their claims against NPS as "negligence, gross negligence, and negligence per se," appellants, in their summary-judgment response, "agree[d] that their case sound[ed] in premises liability and not ordinary negligence." NPS asserted, however, that appellants failed to actually assert a premises liability claim in their petition. As discussed below, we conclude that appellants' allegations against NPS, in substance, asserted a premises liability claim.

5

h.	failing to fix dangerous conditions and/or warn about dangerous conditions;

. . . .

k.	recklessly failing to ensure the safety of its equipment for use;

l.	fail[ing] to take adequate precautionary measures; [and]

m.	recklessly disregarding the safety of [Torres][.]

Torres sought damages for medical expenses, pain and suffering, physical impairment, mental anguish, and lost earnings.  Enedina sought damages for lost financial support, affection, companionship, society, and consortium.

PRSI filed a combined no-evidence and traditional motion for summary judgment.  PRSI asserted, as pertinent here, that Torres was an employee of Ryan, who was an independent contractor under the December 22, 2014 "Standard Terms and Conditions for General Services Between [PRSI] and [Ryan] for Mechanical Flare Gas Recovery Unit System" ("Contract"); that Ryan controlled the operative details of its work; that PRSI did not retain contractual control or exercise actual control over the details of the work; and that, as a premises owner, PRSI did not owe Torres a duty to ensure that Ryan safely performed its work.

PRSI asserted that the terms of the Contract, discussed below, expressly disclaimed any contractual control on the part of PRSI over the operative details of Ryan's work.  PRSI further asserted that the testimony established that Ryan, and not PRSI, exercised actual control over the operative details of Torres's work. Namely, Torres testified in his deposition that Ryan personnel controlled his work

at the PRSI facility, that Ryan directed Torres where to work and when, that Ryan warned him about the hazards, and that it was a Ryan employee, Chavez, who had directed Torres to climb the scaffold and assist with the hot tap on the day of the fall. Further, a Ryan supervisor, Lance Harp, testified that PRSI's role was limited to start and stop authority, inspection of progress, and general safety protocols.

In their response to PRSI's motion, appellants argued, as pertinent here, that PRSI owed Torres a duty to ensure that Ryan performed its work safely because the evidence established that PRSI retained contractual control and exercised actual control over details of the work. Specifically, the Contract, as discussed below, "establishe[d] PRSI's retention of contractual control over the safety of the work." And, the evidence showed that "PRSI was actively engaged in directing, supervising, and controlling the details of the work that Torres and [Ryan] were performing."

NPS also filed a combined no-evidence and traditional motion for summary judgment. NPS asserted that it was entitled to judgment because appellants' allegations constituted an assertion of premises liability, but they failed to plead a premises liability claim. Rather, they asserted negligence claims. NPS also argued that it had no duty to Torres because there was no evidence that it owned or controlled the premises or that it controlled the details of Torres's work. And, there was no evidence that it breached a duty or that such breach caused Torres's damages. NPS asserted that its evidence showed that its scaffolding was compliant with safety

7

requirements and asserted that it had no duty to provide fall protection because Ryan had declined it.

In their response to NPS's motion, appellants argued that the evidence demonstrated that NPS, a premises occupier, exercised actual control over the scaffold at issue and thus it owed Torres a duty to keep it safe. Only NPS was authorized to construct, modify, and inspect its scaffolds. And, NPS incorrectly installed the platform access gate, which required Torres to reach horizontally from the ladder to transition to the platform. In addition, NPS performed daily safety inspections of the scaffold at issue and had, on the day of Torres's fall, tagged the scaffold in a manner authorizing its use. Appellants asserted that NPS failed to take into account the access issues, i.e., the gate and tarp, and that the scaffold lacked a self-retractable lifeline, which PRSI's and NPS's policies required. Appellants asserted that NPS's breaches of duty were the proximate cause of Torres's injuries.

The trial court rendered summary judgment for PRSI and NPS, and ordered that appellants take nothing on their claims. The trial court denied appellants' motion for new trial.

**Summary Judgment**

In their first and sixth issues, appellants generally challenge the trial court's summary judgments in favor of PRSI and NPS. They assert that the evidence raises fact issues as to the elements of each of their claims. In their second issue, appellants

8

assert that the evidence raises fact issues as to the duty element of their claim against PRSI. In their third issue, appellants assert that the evidence raises fact issues as to the duty element of their claim against NPS. In their fourth issue, appellants assert, with respect to their claims against both PRSI and NPS, that the trial court erred in failing to find that the "necessary use" exception applies. In their fifth issue, appellants assert that PRSI and NPS owed Torres a duty under a theory of negligent undertaking.

## A.    Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id.* If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the asserted grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

A party may combine in a single motion a request for summary judgment under the no-evidence and traditional standards. *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(c), (i). When a party seeks summary judgment on both grounds and the trial court's order does not specify its

reasons for granting summary judgment, we first review the propriety of the summary judgment under the no-evidence standard. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *see also* TEX. R. CIV. P. 166a(i). If we conclude that the trial court did not err in granting summary judgment under the no-evidence standard, we need not reach the issue of whether the trial court erred in granting summary judgment under the traditional standard. *See Ridgway*, 135 S.W.3d at 600; *see also* TEX. R. CIV. P. 166a(c).

To prevail on a motion for no-evidence summary judgment, the movant must establish that there is no evidence to support an essential element of the non-movant's claim on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movant to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A no-evidence summary judgment may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

10

In a traditional motion for summary judgment, the movant has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When a defendant moves for a traditional summary judgment, it must either: (1) conclusively negate at least one essential element of the plaintiff's cause of action or (2) conclusively establish each essential element of an affirmative defense. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). If the movant meets its burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Evidence raises a genuine issue of fact if reasonable jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## B. Applicable Legal Principles

"[A] person injured on another's property may have either a negligence claim or a premises-liability claim against the property owner." *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016). "Negligence and premises liability claims . . . are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). In a negligence claim, a plaintiff must prove the existence of

11

a legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Sols., Inc*., 464 S.W.3d 338, 352 (Tex. 2015). In a premises liability claim, a plaintiff must prove: (1) that the defendant had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm; (3) that the defendant failed to exercise reasonable care to reduce or eliminate the risk; and (4) that the defendant's failure proximately caused the plaintiff's injuries. *United Scaffolding*, 537 S.W.3d at 471. When a plaintiff alleges injury as a result of a physical condition or defect on the premises, premises liability principles apply. *Id.* at 472. "[S]lip/trip-and-fall cases have consistently been treated as premises defect causes of action." *Id.* (holding alleged injury resulting from fall through scaffolding platform that was not properly secured constituted premises liability claim).

The threshold inquiry in a premises liability claim is whether the defendant owed a duty to the injured person. *Hillis v. McCall*, 602 S.W.3d 436, 440 (Tex. 2020). "The existence of a duty is a question of law for the court to decide." *Id.* The duty owed depends upon the role of the person injured on the premises. *Id.*

Here, the duties owed by PRSI and NPS to Torres, if any, are determined by the law governing a premises owner's or general contractor's duty to an independent

contractor's employee.[5] *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605–06 (Tex.

2002) (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 n.1 (Tex. 1999) ("A

general contractor owes the same duty as a premises owner to an independent

contractor's employee. Thus, cases considering the duties of premises owners and

general contractors are used interchangeably.")).

In this context, the duty owed depends upon the type of premises defect

alleged. "There are two types of premises defects for which an independent

contractor's employee may seek to hold the general contractor liable." *Clayton W.*

*Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). The first category,

pre-existing defects, includes those defects or conditions that exist on a premises

when a business invitee enters for business purposes. *Id*. "Only concealed

hazards—dangerous in their own right and independent of action by another—that

are in existence when the independent contractor enters the premises fall into this

first []category." *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223,

---

[5] It is undisputed that PRSI is a premises owner. With respect to NPS, an independent contractor or subcontractor on a construction site, who is in control of the premises, is charged with the same duty as an owner or possessor. *Rendleman v. Clarke*, 909 S.W.2d 56, 60 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd) (citing RESTATEMENT (SECOND) OF TORTS § 384 cmt. d (1965) (subcontractor subject to liability for harm done by work entrusted to him)).

13

225 (Tex. 1999); *see, e.g.*, *Smith v. Henger*, 226 S.W.2d 425, 430–31 (Tex. 1950) (open shaft on jobsite).[6]

The second category includes defects or conditions that are created by or arise from the independent contractor's (or its injured employee's) work activity. *Olivo*, 952 S.W.2d at 527; *see Dow Chem.*, 89 S.W.3d at 606.

Here, appellants alleged that Torres, a Ryan employee, was injured on PRSI's premises when he fell from defective scaffolding constructed by Ryan subcontractor, NPS. It is undisputed that the scaffold at issue was not on the PRSI premises when Ryan entered. Rather, PRSI hired Ryan to perform the work, and then Ryan retained NPS to build the scaffolding for the work. Thus, appellants' claims fall under the second category. *See Olivo*, 952 S.W.2d at 527; *see Dow Chem.*, 89 S.W.3d at 606.

---

[6] With respect to pre-existing defects, a premises owner "has a duty to inspect the premises and warn the independent contractor/invitee of dangerous conditions that are not open and obvious and that the owner knows or should have known exist." *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex. 1999). The rationale is that the owner is in a "superior position to know of or discover hidden dangerous conditions on his premises." *Griffin v. Shell Oil Co.*, 401 S.W.3d 150, 159 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 746 (Tex. 1973)). With respect to pre-existing conditions that *are* open and obvious or known to the invitee, however, the general rule is that an owner has no duty to warn because the law presumes that the invitee will take reasonable measures to protect himself. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015). But, a "necessary-use" exception may apply if (1) it was necessary for the invitee to use the portion of the premises with the condition and (2) the owner should have anticipated that the invitee was unable to avoid the risks despite his awareness. *Id.* at 207.

14

Under the second category, when a dangerous condition arises from an independent contractor's work, the premises owner or general contractor "ordinarily has no duty to warn the independent contractor's employees" of the condition. *Olivo*, 952 S.W.2d at 527. "The rationale for this rule is that a general contractor normally has no duty to ensure that an independent contractor performs its work in a safe manner." *Id.*

In 1985, the supreme court recognized a limited exception. In *Redinger v. Living, Inc.*, the court held that if a general contractor exercises "some control" over an independent contractor's work, a duty arises to exercise reasonable care in supervising the activity. 689 S.W.2d 415, 418 (Tex. 1985). The court adopted Restatement (Second) of Torts, section 414, which states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the [premises owner] owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 414 (1977)). Since *Redinger*, however, the supreme court has expressly limited the duty that arises on the part of a premises owner or general contractor.

In *Koch Refining*, the supreme court noted: "Every premises owner must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability." 11 S.W.3d at 156. The court noted

that, in *Redinger*, it adopted only a "limited-duty rule" and that the comments to section 414 state that:

> [i]n order for the rule stated in this Section to apply, the [premises owner] must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports. . . .

*Id*. at 155 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c).

In *Dow Chemical*, the supreme court held that, for a duty to arise, a premises owner must have retained the right to control the "operative details," that is, the "means, methods, or details," of the independent contractor's work. 89 S.W.3d at 606, 608; *see, e.g.*, *Redinger*, 689 S.W.2d at 418 (imposing duty on general contractor who was on worksite and exercised control over work by issuing on-site orders directing means and method that caused plaintiff's injury). In addition, the control "must relate to the injury." *Dow Chem.*, 89 S.W.3d at 606.

When the injury arises from an alleged failure by the premises owner to maintain a safe workplace, the inquiry focuses on whether the premises owner retained control over the condition or activity that caused the injury. *See United Scaffolding*, 537 S.W.3d at 479 (holding that "relevant inquiry" was defendant's right of control over work site's *scaffold* and subsequent responsibility to warn about or remedy dangerous condition thereon and that court of appeals erred in expanding scope of inquiry to consider control over general refinery operations); *Lee Lewis*

16

*Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001) (considering defendant's control over *fall-protection systems* used by independent contractor's employees).

A premises owner or general contractor who requires that an independent contractor observe workplace safety guidelines does not incur an unqualified duty to ensure the safety of the independent contractor's employees. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357–58 (Tex. 1998). Notably, "safety requirements give rise to a *narrow* duty of care." *Id*. at 356. That is, a premises owner or general contractor who "promulgates mandatory safety requirements and procedures owes only a narrow duty to ensure that those requirements and procedures do not 'unreasonably increase, rather than decrease, the probability and severity of injury.'" *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 867 (Tex. 2021) (quoting *Mendez*, 967 S.W.3d at 358). Further, "*requiring compliance* with safety procedures does not give rise to a duty to an independent contractor's employees so long as those procedures do not unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* at 869 (emphasis added, internal quotations omitted).

## C.    Summary Judgment for PRSI

In their second issue, appellants argue that the evidence raised fact issues as to the duty element of their premises liability claim against PRSI because it showed that PRSI retained or exercised control over the operative details of Ryan's work.

17

We consider whether appellants presented evidence that PRSI retained or exercised control over the scaffold at issue and over Ryan's employees' use of fall-protection systems. *See United Scaffolding*, 537 S.W.3d at 479 (holding that "relevant inquiry for determining what, if any, duties [were] owed" was defendant's "control over the scaffold itself"); *Lee Lewis Const.*, 70 S.W.3d at 783 (holding that issue presented was control over fall-protection systems used by independent contractor's employees). Such control may be established through: (a) evidence of a contractual agreement in which PRSI expressly retained control over the "means, methods, or details" of Ryan's work, that is, over the scaffold itself or Ryan's employees' use of fall-protection systems or (b) evidence that PRSI actually exercised such control. *See Dow Chem.*, 89 S.W.3d at 606.

In its no-evidence motion for summary judgment, PRSI argued that it was entitled to judgment because there was no evidence that it (1) retained such contractual control or (2) exercised such actual control. *See* TEX. R. CIV. P. 166a(i).

### 1. *Contractual Control*

Appellants assert that the terms of the Contract between PRSI and Ryan establish PRSI's retention of contractual control over the work. In support of their assertion, they presented a copy of the Contract.

Our primary objective in construing a contract is to give effect to the parties' intent. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888

18

(Tex. 2019). We interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs otherwise. *Id.* We consider the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* at 889. "Contract terms cannot be viewed in isolation . . . because doing so distorts meaning." *Id.* "Consistent with our long-established precedent," "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Id.* (internal quotations omitted). Whether a contract grants a right of control is a question of law for the court. *Dow Chem. Co.*, 89 S.W.3d at 606.

Appellants assert that the provision in bold emphasis below, which we consider in its context at Exhibit C to the Contract, "PRSI General HSE [Health, Safety, and Environmental] Requirements," establishes PRSI's retention of contractual control over the work:

> *[Ryan] shall be fully and completely responsible for managing all HSE considerations* associated with its performance of the work unless specific direction is otherwise provided in writing by PRSI.
> . . . .

> *[Ryan] shall not allow an unsafe . . . condition* or behavior over which it has control to be conducted during performance of the work. When such a condition or behavior is identified by [Ryan], the related activity shall be discontinued until the condition or behavior has been eliminated or mitigated. If [Ryan] does not have the ability to eliminate or mitigate the condition or behavior, it shall immediately notify PRSI in writing.

. . . .

PRSI shall have *the right, but not the obligation,* to inspect the worksite and associated work records and to interview personnel to ascertain that [Ryan] is complying with the expectations and requirements of this attachment.

Should [Ryan] fail to observe the requirements of this attachment, PRSI shall have *the right* to stop the work performed by [Ryan] at the worksite and to take the action necessary to resolve the condition with all related costs of such action for [Ryan's] account.

. . . .

Stop Work or Suspension. The PRSI has *the right* to stop or suspend the work of [Ryan] for any reason, including, but not limited to, [Ryan's] failure to comply with any of the safety and health requirements either set forth in this Contract or incorporated by reference.

***Correction of Deficiencies. When the PRSI notifies [Ryan], either verbally or in writing, that [Ryan] is not complying with a safety and health requirement either set forth in this Contract or incorporated by reference, [Ryan] shall correct the deficiency immediately.***

. . . .

B.      Worksite Safety.

. . . .

*[Ryan] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with performance of the work. . . .*

. . . .

Personal Protective Equipment

. . . .

*[Ryan] shall provide and require* all personnel to wear specialty personal protective equipment as required by the task or specified on the work permit (e.g., *fall protection systems . . .* ) . . . .

(Emphasis added.)  Appellants assert that the bold emphasized language granting PRSI a right to require Ryan to correct an unsafe work practice constituted retained control over the operative details of Ryan's work and therefore created a duty on the part of PRSI to either warn Torres of the unsafe scaffolding or to make it safe.

Read as a whole, however, Exhibit C, which governs Health and Safety requirements and "Worksite Safety," expressly states that *Ryan "shall be fully and completely responsible* for managing *all* HSE considerations associated with its performance of the work" and "*shall be responsible for initiating, maintaining and supervising all safety precautions* and programs in connection with performance of the work."  (Emphasis added.)  With respect to fall-protection systems, the Contract expressly requires Ryan, not PRSI, to "*provide and require* all personnel to wear specialty personal protective equipment as required by the task or specified on the work permit (e.g., *fall protection systems . . .*)." (Emphasis added.)

Exhibit C provides that PRSI reserved a "right, but not the obligation," to inspect the worksite to ascertain whether Ryan was complying with the HSE requirements, and PRSI reserved a "right" to stop the work.  It is well established that reserving a "general right to order the work stopped" or to inspect its progress is not evidence of retained control.  *Dow Chem.*, 89 S.W.3d at 606–08 ("[I]t is not enough that the premises owner has merely a general right to order the work stopped."); *Koch Ref.*, 11 S.W.3d at 155; *see also Gonzales v. Ramirez*, 463 S.W.3d

21

499, 506–07 (Tex. 2015) ("[A] possibility of control is not evidence of a 'right to control' actually retained. . . ."); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 702 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding right to forbid independent contractor from working without fall protection did not impose duty to ensure that independent contractor's employees used fall protection); *Victoria Elec. Co-op, Inc. v. Williams*, 100 S.W.3d 323, 330 (Tex. App.—San Antonio 2002, pet. denied) (retaining "latitude to 'inspect, test, and approve' . . . work to make sure it was complying with . . . safety requirements" did "not implicate a right to control the details of the independent contractor's work"). Imposing liability on premises owners who retain a right to order the work stopped "would deter [them] from setting even minimal safety standards." *Dow Chem.*, 89 S.W.3d at 608.

Further, reading the Contract as a whole reflects that section 1.2 designates Ryan as an "independent contractor" and makes it *solely* responsible for the supervision, direction, and control of its employees and subcontractors. In addition, section 1.2 expressly disclaims that PRSI retained any right to control the "manner or method" of Ryan's work, as follows:

> **1.2 INDEPENDENT CONTRACTOR**. The Parties agree that Contractor is and always shall be an independent contractor in the performance of *every part* of this Contract. . . . PRSI *shall not have the right to control or direct the manner or method* of the performance or providing of the Services/Goods by [Ryan]. PRSI is interested only in the results obtained and has only the general right of inspection and

supervision in order to secure the satisfactory completion of Services/Goods.

(Emphasis added.)

In *Dow Chemical*, the Texas Supreme Court held that a contract with similar terms did not, as a matter of law, impose a duty on the premises owner. 89 S.W.3d at 607. There, the premises owner and general contractor, Dow, retained Gulf States as an independent contractor, and Gulf States employed Bright as a carpenter. *Id.* at 605. While Bright was working on Dow's premises, he was injured by falling pipe put in place by another Gulf States employee. *Id.* After Bright sued Dow for premises liability, the parties filed cross-motions for summary judgment on the duty element of Bright's claim. *Id.* Dow asserted that it had no duty to ensure the safety of an independent contractor's employee. *Id.* Bright asserted that Dow retained contractual control over the work based on the following terms in their contract:

> 22.01. Safety—CONTRACTOR shall take all necessary precautions for the safety of the employees on the work and shall comply with all safety rules and regulations of DOW as set forth in the Safety and Loss Prevention Manual for CONTRACTORS . . . .
> . . . .
> 30.01. Responsibilities—CONTRACTOR shall be an independent contractor under this Contract and shall assume all of the rights, obligations and liabilities, applicable to it as such independent contractor hereunder and any provisions in this Contract which may appear to give DOW the right to direct CONTRACTOR as to details of doing the work herein covered or to exercise a measure of control over the work shall be deemed to mean that CONTRACTOR shall follow the desires of DOW in the results of the work only.

*Id.* at 606–07. Thus, the contract terms provided that Gulf States was an independent contractor, required it to comply with safety regulations set by Dow, and expressly disclaimed that Dow retained any right to control the details of the independent contractor's work. *Id.* The supreme court held that, as a matter of law, the contract did not impose a duty on Dow because "Dow did not retain the right to control the means, methods, or details of Bright's work." *Id.* at 607.

In *JLB Builders*, the supreme court considered a similar contract stating that the independent contractor there was to perform as such and was solely responsible for the supervision, direction, and control of its employees, "for the manner and means of accomplishing the Work," and "for initiating, maintaining and supervising all safety precautions and programs in its Work." 622 S.W.3d at 869. The contract also similarly stated that the general contractor had "no authority to direct, supervise or control the means, manner or method of construction of the Work." *Id.* The supreme court held that such provisions "clearly do not confer a right to control" and that it saw "no indication that [the general contractor's] supervisory control extended to the means and methods of [the] work." *Id.* at 869–70. The contract there also required the independent contractor to comply with numerous safety procedures, including a detailed "Fall Protection Plan" mandating safety harnesses. *Id.* at 869. The court noted that "requiring compliance with safety procedures does not give rise to a duty to an independent contractor's employees so long as those procedures do

not unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* (internal quotations omitted). And, the plaintiff did not explain how the procedures unreasonably increased the probability and severity of injury. *Id*. The supreme court held as a matter of law that the contract did not provide a basis for imposing liability on the general contractor. *Id*. at 870.

Here, the Contract between PRSI and Ryan, like the contracts in *Dow* and *JLB*, expressly disclaimed any right on the part of PRSI to control the "manner or method" of Ryan's work. *See id*. at 869; *Dow Chem*., 89 S.W.3d at 606–07. Also similarly, the Contract expressly designated Ryan as an independent contractor and made it solely responsible for the supervision, direction, and control of its employees and subcontractors. *See JLB*, 622 S.W.3d at 869; *Dow Chem*., 89 S.W.3d at 606–07. And, the Contract made Ryan "*fully and completely responsible* for managing all HSE considerations associated with its performance of the work" and "for *initiating, maintaining and supervising all safety precautions*." (Emphasis added). In addition, *Ryan*, not PRSI, was required to "*provide* and *require* all personnel to wear specialty personal protective equipment . . . (e.g., *fall protection systems* . . .)." (Emphasis added.) Because there is no evidence that PRSI retained control over the "the means, methods, or details" of Ryan's work, PRSI established as a matter of law that it owed no duty to Torres to ensure the safe performance of the work. *See JLB Builders*, 622 S.W.3d at 869–70; *Dow Chem*., 89 S.W.3d at 606–07.

25

Further, PRSI's reservation of a "right, but not the obligation," to inspect the worksite and a "right" to stop the work are not evidence of retained control. *See Dow Chem.*, 89 S.W.3d at 607–08. The supreme court has expressly held that a premises owner's implementation of mandatory safety procedures in creating a safer construction site "does not serve as evidence" that its independent contractors are "not free to do the work in their own way and is not evidence that [the owner] controlled the method of work or its operative details." *Id*. at 608. "[R]equiring compliance with safety procedures does not give rise to a duty to an independent contractor's employees so long as those procedures do not unreasonably increase, rather than decrease, the probability and severity of injury." *JLB Builders*, 622 S.W.3d at 869 (internal quotations omitted). There is no allegation in this case that PRSI promulgated safety rules or requirements that increased the probability or severity of Torres's injury. *See id*.

We hold as a matter of law that the Contract did not provide a basis for imposing a duty of care on PRSI to ensure the safe performance of Ryan's or Torres's work. *See id*. at 870.

## 2. *Actual Control*

Appellants also argue that PRSI exercised actual control over the work because PRSI was "actively engaged in directing, supervising, and controlling the details of the work that Torres and [Ryan] were performing."

26

In the absence of a contractual agreement, control may be established by evidence that the premises owner actually exercised control over the manner in which the independent contractor's work was performed. *Dow Chem.*, 89 S.W.3d at 606–07. This inquiry focuses on whether appellants presented evidence that PRSI exercised actual control over the safety of the scaffold at issue or Ryan's employees' use of fall-protection systems. *See United Scaffolding*, 537 S.W.3d at 479 (holding relevant inquiry was defendant's right to control *scaffold* and responsibility to warn about or remedy dangerous condition thereon and that court of appeals erred in expanding scope of inquiry to factors such as control over refinery operations); *Lee Lewis Constr.*, 70 S.W.3d at 783 ("[W]e must determine if [plaintiffs] presented more than a scintilla of evidence that [the general contractor] exercised actual control over safety, in particular, the *fall-protection systems* used by [the independent contractor's] employees.") (emphasis added)).

In *Ellwood Texas Forge*, the court concluded that there was no evidence of actual control. 214 S.W.3d at 704. There, Ellwood, a steel-foraging plant, hired PI, an independent contractor, to replace an air conditioner. *Id*. at 695–96. Jones, an employee of PI, was injured when he fell from a ladder during the work. *Id*. at 696. Jones, who was not wearing fall-protection equipment at the time of his fall, sued Ellwood. *Id*. Ellwood's safety policies required independent contractors' employees working over six feet above ground to use fall-protection equipment, and provided

27

that Ellwood had a right to enforce its safety rules and stop the work. *Id*. at 701. Before the work began, an Ellwood maintenance coordinator, Wegner, signed a safe work permit intended to identify the specific jobs that PI was to perform and the required safety equipment, but no fall-protection devices were listed. *Id*. at 696. Wegner testified that he did not know that PI employees were working without fall protection; Jones testified that Wegner was at the jobsite and was aware. *Id*.

On appeal, Ellwood argued that there was no evidence that it exercised actual control over the safety of the jobsite. *See id*. at 698, 701. Jones argued that Ellwood had such control because it "had a right to forbid [PI] from working without fall protection and to dictate what fall protection [PI] used." *Id*. at 697–98. The court held that "Ellwood's right to forbid PI employees from doing their work in a dangerous manner [was] insufficient to impose a duty on Ellwood to ensure that PI and its employees followed Ellwood's safety rules and regulations." *Id*. at 698. Instead, a premises owner assumes only a narrow duty to ensure that its rules or requirements do not unreasonably increase the probability and severity of injury. *Id*. at 702. Actual control is not demonstrated by having a "right to preclude work from beginning in the first instance or stopping it after it has commenced" or by placing a safety representative on site to observe the independent contractor's work. *Id*.

In support of their argument, appellants rely on *Lee Lewis Construction*, 70 S.W.3d 778. There, a hospital hired a general contractor, LLC, to remodel a building

tower. *Id.* at 782. LLC hired an independent contractor, KK Glass, to provide glass work on the project. *Id.* While Harrison, a KK employee, was working on the tower's tenth floor, he fell and suffered fatal injuries. *Id.* It was undisputed that Harrison was not using an independent lifeline that would have stopped his fall. *Id.* Harrison's wife sued LLC. *Id.* The supreme court considered whether Harrison presented evidence that LLC exercised actual control over safety, i.e., the fall-protection systems used by KK employees. *Id.* at 783. The record showed that LLC's president assigned its job superintendent "the responsibility to routinely inspect the ninth and tenth floor addition to the south tower to see to it that the subcontractors and their employees properly utilized fall protection equipment." *Id.* at 784. LLC's superintendent "personally witnessed and approved of the specific fall-protections systems [KK] used" and "knew of and did not object to [KK] employees using a bosun's chair without an independent lifeline."[7] *Id.* The supreme court concluded that this testimony constituted more than a scintilla of evidence of actual control over the fall-protection systems on the jobsite. *Id.*

In *Dow Chemical*, the supreme court examined *Lee Lewis*. As discussed above, Dow retained Gulf States, an independent contractor, who employed Bright. 89 S.W.3d at 605. After Bright, while working on Dow's premises, was injured by

---

[7]    A "bosun's chair" is a "wooden board suspended from the roof by a rope." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 790 (Tex. 2001) (Hecht, C.J., concurring).

a falling pipe put in place by another Gulf States employee, Bright sued Dow. *Id.* With respect to *actual* control imposing a duty on Dow, Bright presented evidence that Dow had conferences with Gulf States' employees, performed on-site inspections, maintained personnel on the work site, and retained a right to stop the work. *Id*. at 607–09. The supreme court concluded that because there was no evidence that Dow had approved how the pipe was secured or, knowing of its dangerous condition, had instructed Bright to perform the work, Dow did not, as a matter of law, exercise actual control. *Id*. at 609. The supreme court noted that it had "never concluded that a [premises owner] actually exercised control of a premises where . . . there was no prior knowledge of a dangerous condition and no specific approval of any dangerous act." *Id*. (emphasis added).

Here, appellants did not, in their summary-judgment response, point to evidence that PRSI had prior knowledge of a dangerous condition with respect to the safety of the scaffold or that it specifically approved a dangerous act. *See id*. Even were we to consider evidence that appellants presented in support of other arguments in their summary-judgment response, i.e., the testimony of PRSI safety supervisor Elliott Johnson that PRSI knew that there was not a self-retracting lifeline on the scaffold at issue, appellants did not direct the trial court to any evidence that PRSI specifically approved a dangerous act, such as ordering Torres to utilize the scaffold despite the lack of safe ingress or self-retracting lifeline. *See id.*

30

Thus, like the supreme court concluded in *Dow*, because appellants did not present evidence that PRSI knew of a dangerous condition and yet specifically approved a dangerous act, the instant case is distinguishable from *Lee Lewis*. *See id.* at 609 ("Had the Dow safety representative actually approved how the pipe in question was secured or instructed Bright to perform his work knowing of the dangerous condition, we could have a fact scenario mirroring *Lee Lewis*."). Accordingly, we conclude that appellants did not present evidence raising a genuine issue of material fact as to actual control exercised by PRSI. *See id.*

In sum, because we conclude that appellants did not present evidence raising a genuine issue of fact as to the duty element of their premises liability claim against PRSI, we hold that the trial court did not err in granting summary judgment in favor of PRSI. *See Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998) ("The nonexistence of a duty ends the inquiry . . . .").

We overrule appellants' second issue.[8]

---

[8]    In addition, we overrule the portions of appellants' first and sixth issues in which they generally assert that the trial court erred in failing to find fact issues with respect to their claim against PRSI. Further, as discussed above, because it is undisputed that the scaffold at issue was not in existence on the PRSI premises when Ryan entered, this is not a pre-existing defects case and the "necessary-use exception" does not apply. *See supra* note 6; *see also Austin*, 465 S.W.3d at 207. Thus, we do not reach the portion of appellants' fourth issue, in which they argue that the trial court erred in concluding that they failed to present evidence raising a fact issue on the applicability of the exception with respect to PRSI.

## D.    Negligent Undertaking

In a portion of their fifth issue, appellants argue that the trial court erred in granting summary judgment in favor of PRSI because, "[a]part from its premises liability, PRSI is also liable to Torres for its negligent undertaking, which is a 'separate and distinct' theory from negligent activity or premises liability." PRSI asserts that this issue is waived because appellants did not plead a claim for negligent undertaking. Appellants argue that, although they did not expressly plead a claim for "negligent undertaking," a fair reading of their petition includes this theory because they alleged that PRSI "control[ed] the placement of defective scaffolding equipment on PRSI's premises" and "fail[ed] to follow its own policies and procedures requiring that its employees ensure that [a] self-retracting lifeline be placed on the scaffold."

One who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured by the undertaking. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119–20 (Tex. 1976). To establish a "negligent undertaking," the plaintiff must show that: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and (3) either (a) the plaintiff suffered harm because of his reliance on the defendant's performance or (b) the

32

defendant's failure to exercise such care increased the plaintiff's risk of harm. *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013) (citing RESTATEMENT (SECOND) OF TORTS § 324A (liability to third person for negligent undertaking)).

The critical inquiry concerning the duty element in a negligent undertaking is whether the defendant acted in a way that requires the imposition of a duty where one otherwise would not exist. *Id.* at 555. Such a duty may arise if a person *affirmatively undertakes to provide services* to another upon which reliance can be based. *See Osuna v. S. Pac. R.R.*, 641 S.W.2d 229, 230 (Tex. 1982) ("Having undertaken to place a flashing light at the crossing for the purpose of warning travelers, the railroad was under a duty to keep the signal in good repair, even though the signal was not legally required."). Appellants' allegations that PRSI *failed* to "control the placement" of scaffolding on its premises and "fail[ed] to" follow its policies and procedures do not allege *affirmative* undertakings. *See Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 397–98 (Tex. 1991).

We overrule this portion of appellants' fifth issue.

### E. Summary Judgment for NPS

In their third issue, appellants argue that the evidence raises fact issues on the duty element of their premises liability claim against NPS because it shows that NPS exercised actual control over the scaffold at issue. In a portion of their first and sixth issues, appellants generally challenge the trial court's summary judgment in favor

of NPS and assert that the evidence raises genuine issues of fact as to the elements of their claim.

## 1.    *Nature of the Claim*

NPS asserted that it was entitled to summary judgment because appellants' claim is based solely in premises liability, and appellants, in their petition, did not plead a premises liability claim. Rather, they asserted only a general negligence claim against NPS. In their summary-judgment response, appellants stated that they "agree[d] that their case sounds in premises liability and not ordinary negligence." The parties dispute whether appellants alleged a premises liability claim.

Again, "[n]egligence and premises liability claims . . . are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor." *United Scaffolding*, 537 S.W.3d at 471. When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. *Id.* When the injury is the result of the property's condition, premises liability principles apply. *Id.* Because negligence and premises liability claims are based on independent theories of recovery, they are not interchangeable. *Id.*

In *United Scaffolding*, a refinery owner, Valero Energy, hired a contractor, United Scaffolding Inc. ("USI"), to construct scaffolding at its refinery. *Id.* at 467. According to Valero's and USI's scaffold policies, USI was required to inspect its

34

scaffolds before each work shift and before each scaffold's use. *Id.* Subsequently, a Valero employee, James Levine, while performing work 15 feet above ground on a USI scaffold, slipped and fell up to his arms through a hole in the scaffold platform. *Id.* Levine sued USI, alleging that USI created a dangerous condition by "improperly assembling, erecting, and/or securing the scaffolding." *Id.* at 472. Levine further alleged that USI failed to "adequately determine dangerous conditions [it] created," "correct the dangerous condition which existed with the scaffolding," "secure the scaffolding in a proper and safe work condition," and warn "that a dangerous condition existed." *Id.* The supreme court concluded that, because Levine claimed that his injury resulted from a physical condition that USI created and then left on the premises, Levine's alleged injury arose from a premises defect. *Id.* at 473.

Here, appellants stated in their petition: "Plaintiffs bring negligence, gross negligence, and negligence per se claims against NPS." They alleged, in pertinent part, that Torres was injured because NPS:

    a.    erect[ed] unsafe scaffolding;

    b.    fail[ed] to ensure that the scaffolding it erected contained proper fall protection;

    c.    fail[ed] to ensure that the scaffolding could be used safely;

    d.    fail[ed] to plan and provide for safe ingress and egress to the scaffold platform;

    e.    certif[ied] that the scaffolding was safe for use, when it in fact was not;

    . . .

    g.    fail[ed] to provide adequate safety equipment; [and]

h.      fail[ed] to fix dangerous conditions and/or warn about dangerous conditions[.]

Thus, like in *United Scaffolding*, appellants' allegations are that Torres was injured by a condition that NPS created and then left on the premises. *See id*. Namely, NPS created a "dangerous condition" by erecting unsafe scaffolding, failing to provide for safe ingress to the scaffold platform, and failing to provide adequate safety equipment. And, NPS failed to rectify or warn of the dangerous condition on the scaffold and certified that the scaffold was safe for use, when in fact it was not.

We conclude that appellants, in their petition, presented a claim based on an allegedly dangerous condition of the premises. *See id.* at 471. Thus, appellants asserted a premises liability claim. *See id*. at 471, 473 ("The only fair reading of Levine's pleadings requires the determination that Levine did in fact allege that USI assumed and retained the right to control the scaffolding it constructed, giving rise to a duty to make and keep the premises safe for business invitees . . . .").

## 2.      *No-Evidence Summary Judgment*

NPS argued that there is no evidence that it owed a duty to Torres because there is no evidence that it "controlled the details of [Torres's] work."

The "relevant inquiry for determining what, if any, duties [NPS] owed to [Torres] is [NPS's] control *over the scaffold itself*." *See id.* at 479 (emphasis added). The inquiry is not whether NPS was present at the work site, but whether NPS retained a sufficient right of control over the scaffold work site, such that it had the

36

responsibility to remedy the condition that Torres alleges caused his injury. *Id.* at 475 (distinguishing between occupancy and control). "The duty question must focus on [NPS's] right to control the scaffold and subsequent responsibility to warn about or remedy a dangerous condition on the scaffold." *See id.* at 479.

Appellants' summary-judgment evidence reflects that Ryan hired NPS to erect, maintain, and inspect scaffolding at PRSI's refinery for Ryan's employees to use in performing turnaround work. Because any contract between Ryan and NPS is not before us, we consider appellants' evidence of NPS's exercise of actual control. *See Dow Chem. Co.*, 89 S.W.3d at 606.

Appellants presented evidence that Elliott Johnson, a PRSI safety supervisor, testified in his deposition that NPS was obligated to inspect each scaffold and ensure that it was safe before Ryan employees used it. Lance Harp, a Ryan field safety supervisor, testified that "the scaffold company," i.e., NPS, built the scaffold at issue, was responsible for it, and that Ryan was "not supposed to alter" the scaffold at all. Harp testified that only NPS was authorized to inspect the scaffold, that NPS inspected its scaffolds "every day," and that NPS was responsible for determining whether a scaffold was safe to use and for assigning the appropriate safety tag. Similarly, Johnson, a PRSI safety supervisor, and Richard Funesti, a PRSI safety manager, each testified that NPS was in control of the scaffold at issue.

In his deposition, Jesse Rodriguez, president of NPS, testified that NPS was responsible for inspecting the scaffold at issue, which included taking into account access to the platform, and allowing people to work on the scaffold:

Q.    Your employees are the ones who are filling out these yellow tags, correct?

A.    Yes.

Q.    And your employees are the ones who are assigning them to say that the scaffold can be used; is that fair?

A.    Well, yes.

Q.    Would you expect your employees to be taking into account things like access and egress when they are signing these yellow tags allowing people to work on the scaffold?

A.    Yes.

In *United Scaffolding*, the Texas Supreme Court concluded that the evidence reflected USI's right to control the scaffolding it constructed. 537 S.W.3d at 478. It was undisputed that Valero hired USI to install, inspect, modify, and dismantle scaffolding at the refinery. *Id.* at 474. The evidence showed that Valero employees were authorized to construct, use, or dismantle a scaffold without first securing USI's permission. *Id.* And, USI was responsible for performing inspections to ensure the scaffold's safety before its use. *Id.* at 477. The court concluded that, once Valero placed USI in the sole position to authorize the use of the scaffolds it constructed, "USI attained the sufficient right to control those scaffolds." *Id.* And, because USI was obligated to inspect the scaffolds before Valero's workers used them, USI maintained the right to control the scaffolds until they were dismantled.

38

*Id.* at 479. The court concluded that the evidence established that USI retained a right to control the scaffold, and thus it owed Levine a duty of care as to the dangerous conditions on the scaffold. *Id.* at 480.

Here, similarly, because appellants presented evidence that NPS was in the sole position of inspecting, and authorizing the use of, its scaffolds, we conclude that appellants presented some evidence that NPS retained control over the scaffold at issue. *See id.* at 477, 479. Thus, appellants presented more than a scintilla of evidence that NPS owed Torres a duty of reasonable care. *See id.*

Accordingly, to the extent that the trial court granted summary judgment in favor of NPS based on its no-evidence motion, we hold that the trial court erred. *See also Griffin*, 401 S.W.3d at 160–62 (holding that trial court erred in granting summary judgment on premises-defect claim because evidence of actual control was presented). Because we conclude that the trial court erred in granting summary judgment under the no-evidence standard, we next consider whether the trial court erred in granting summary judgment under the traditional standard. *See Ridgway*, 135 S.W.3d at 600; *see also* TEX. R. CIV. P. 166a(c).

### 3. *Traditional Summary Judgment*

In its motion for traditional summary judgment, NPS argued that it was entitled to judgment because the summary-judgment evidence conclusively established that: (1) NPS did not own or have control over the premises; (2) NPS

39

"did not owe [Torres] a legal duty on the day of the incident"; (3) "even if there was a duty, NPS did not breach a legal duty to [Torres]"; and (4) NPS was not the proximate cause of Torres's injuries.

With respect to the duty element, NPS asserted that appellants' "cause of action against it is limited as a matter of law to the Texas definition of premises liability as set forth in *Austin v. Kroger Tex[as], L.P.*," as follows: "Applying the general rule, the Court has repeatedly described a landowner's duty as a duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." 465 S.W.3d at 203. And, "because the weather, rainwater, wet surfaces and the tarp [were] all open and obvious, not concealed and were all known to [Torres] before he elected to put himself in position to fall, NPS had absolutely no duty to warn, no duty to make the conditions safe and has no liability as a matter of law." As discussed above, however, this is not a pre-existing defects case. *See Coastal Marine.*, 988 S.W.2d at 225.

With respect to conditions arising from an independent contractor's work, as here, the "relevant inquiry is whether the [contractor] assumed sufficient control over the part of the premises that presented the alleged danger so that the [contractor] had the responsibility to remedy it." *See United Scaffolding*, 537 S.W.3d at 473–74 (applying control test in suit by injured refinery employee against scaffold builder).

40

Thus, whether NPS owed Torres a premises duty must be determined by examining whether NPS "maintained a right to control the scaffold that allegedly caused [Torres's] injury." *See id.* at 475. Again, control "may be expressed by contract or implied by conduct." *Id.* at 473.

Because NPS's summary-judgment evidence does not contain its contract, if any, with Ryan, we consider whether NPS presented summary-judgment evidence conclusively negating its duty, that is, its actual control over the scaffold at issue. *See id.* at 474, 476; *see also Siegler*, 899 S.W.2d at 197 (defendant moving for traditional summary judgment must disprove at least one essential element of plaintiff's cause of action).

Under its premises-liability point in its traditional summary-judgment motion, NPS, without citing evidence, simply states: "Here, NPS did not own or have control of the premises. Most importantly, NPS did not owe any duty to [Torres]."

Elsewhere in its summary-judgment motion, NPS relies on the PRSI Incident Investigation report, email correspondence regarding Torres's accident report, Torres's medical records, a photograph of the scaffold at issue, and excerpts of the depositions of Torres, Harp, Funesti, Reynolds, and Johnson.

In the medical records and excerpts of Torres's testimony that NPS cites, Torres stated after his fall that he was injured because he lost his footing on the ladder, and he testified that his feet were muddy, that he saw the tarp blocking the

41

entry into the scaffold before he climbed the ladder, and that he fell when he lifted the tarp over his head.

In the excerpts of deposition testimony that NPS appended as its summary-judgment evidence, Harp, a Ryan safety supervisor, testified that only NPS inspected and safety-tagged the scaffolds it built. NPS inspected the scaffold at issue and tagged it as safe for use by Ryan employees, including Torres. Harp testified that an NPS "scaffold crew" "would come by and update [the safety tags] every day."

Funesti, a PRSI safety manager, testified that NPS was responsible for inspecting its scaffolds on the premises and assigning safety tags. He noted that a "green tag" means "you can just use it, you don't need any fall protection." A yellow tag" means that "you can use it," subject to certain criteria marked off on the tag. A "red tag" means "you don't use it." Funesti testified that the tarp on the scaffold from which Torres fell constituted a dangerous condition. He noted: "NPS— because it was a scaffold, I would expect the scaffold builder to look at it because of it being [a] scaffold. From my assessment something with a tarp, fire blankets or so, they would look at that to make sure it's safe . . . ." And, Reynolds, a PRSI construction supervisor, testified that NPS had a duty to identify means for safe access and egress to the scaffolds it built.

Johnson, a PRSI safety supervisor, testified that having to reach three or four feet at the gate to the scaffold platform created a safety hazard. And, on March 18,

42

2015, the day of Torres's fall, NPS inspected the scaffold at issue, noted it as "in compliance," and assigned it a "yellow tag," which indicated that the scaffold could be used, but "[f]all protection ha[d] to be utilized." However, Johnson testified, Torres's tie-off points were limited and, as such, NPS's policies required the use of a retractable lifeline or ladder cage, neither of which were there.

As discussed above, the supreme court held in *Lee Lewis Construction* that evidence that the general contractor performed inspections, was aware of the dangerous condition, and approved the dangerous act constituted more than a scintilla of evidence that the contractor retained an actual right of control. 70 S.W.3d at 784. Thus, the contractor owed the subcontractor's employee a duty of care. *Id.*

Similarly, here, NPS's own summary-judgment evidence shows that it had the sole authority to inspect its scaffolding on the premises, that it inspected its scaffolding every day, that it inspected the scaffold at issue on the same day that Torres fell, that the gate and tarp were in place at the time of the inspection and constituted dangerous conditions, and that NPS specifically approved the scaffold for use. And, although a yellow safety tag indicated that fall-protection was required, none was present.

Taking as true all evidence favorable to appellants, as non-movants, and indulging every reasonable inference and resolving any doubts in their favor, as we must, we conclude that NPS's own summary-judgment evidence constitutes more

43

than a scintilla of evidence that NPS retained actual control over the scaffold. *See Valence Operating Co.*, 164 S.W.3d at 661. Thus, NPS has not conclusively negated the duty element of appellants' claim. *See Lee Lewis Constr.*, 70 S.W.3d at 784. Because NPS's summary-judgment evidence does not establish its right to judgment, the burden never shifted to appellants to present evidence to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *see also City of Hous. v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) (holding non-movant not required to respond if deficiencies in movant's own proof or legal theories defeat movant's right to judgment as matter of law). Accordingly, we hold that the trial court erred in granting summary judgment in favor of NPS.

We sustain appellants' third issue and the remainder of their first and sixth issues, in which they generally assert that the trial court erred in granting summary judgment in favor of NPS and failed to find fact issues.[9]

---

[9] Having sustained appellants' third issue, we do not reach the remainder of their fourth issue, in which they assert that the necessary-use exception applies to their claim against NPS. *See* TEX. R. APP. P. 47.1. Similarly, we do not reach the remainder of appellants' fifth issue, in which they assert that NPS "owed a negligent-undertaking duty of care." *See id*.

## Conclusion

We reverse the portion of the trial court's judgment in which it grants summary judgment in favor of NPS on appellants' claim and remand for further proceedings. We affirm the remainder of the trial court's judgment.

Sherry Radack
Chief Justice

En Banc reconsideration was requested. TEX. R. APP. P. 49.5. A majority of the justices of the Court voted in favor of reconsidering the case en banc.

The en banc court consists of Chief Justice Radack and Justices Kelly, Goodman, Landau, Hightower, Countiss, Rivas-Molloy, Guerra, and Farris.

Chief Justice Radack, writing for the majority of the en banc court, joined by Justices Landau, Hightower, Countiss, Rivas-Molloy, Guerra, and Farris.

Justice Kelly, dissenting, with opinion to follow.

Justice Goodman, dissenting, without opinion, for the reasons expressed in the panel opinion issued on May 10, 2022.